MARIE R. TROTH, INDIVIDUALLY, AS ADMINISTRATRIX OF THE ESTATE OF FLOYD L. TROTH, AND AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE HEIRS–AT–LAW OF FLOYD R. TROTH, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

Argued November 29, 1988—Decided November 20, 1989.

260

---

*Gary D. Thompson* argued the cause for appellants (*Cresse, Carr, Peaslee and Thompson,* attorneys).

*Jerry Fischer,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Valerie L. Egar,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

STEIN, J.

Plaintiff instituted this action to hold the State of New Jersey accountable for the death of her husband and the serious injuries she sustained when their small fishing boat was swept over the spillway on Union Lake Dam, located on a 4,300–acre recreational tract owned by the State. The gist of the complaint and the affidavits opposing the State's summary judgment motion was that because of the configuration of the spillway at higher-than-normal water levels, the flow velocity near the spillway created a "dangerous condition" for small fishing boats, providing a basis for liability under the New Jersey Tort Claims Act (the "Act"). *See N.J.S.A.* 59:4–2. The Law Division denied the State's motion for summary judgment. The Appellate Division reversed, 222 *N.J.Super.* 420 (1988), holding that the State was immune from liability pursuant to

*N.J.S.A.* 59:4–8 and –9 because Union Lake is "unimproved public property." We granted certification, 111 *N.J.* 565 (1988), and now reverse.

## I.

Union Lake Dam is one of the oldest dams in the State of New Jersey. Built in the nineteenth century, the 2,000–foot-long, thirty-five-foot-high, earthen structure impounds the Maurice River and creates Union Lake. It has a 200-foot wide concrete and masonry spillway over which excess water flows into the Maurice River. The dam lies at the southernmost tip of a 4,300–acre wildlife-management area that was transferred to the State of New Jersey in 1982.

On the morning of June 22, 1983, Marie Troth and her husband, Floyd, went fishing on Union Lake. The Troths lowered their fourteen-foot aluminum-hulled fishing boat into the lake from the boat-launching ramp, located at the same end of the lake as the dam. Turning on their electric trolling motor, the Troths made their way across the lake to an area near the dam. While the two were trolling, the fishing lines became entangled in undergrowth. Mr. Troth reversed the trolling motor and backed up in the direction of the snag. As they were retrieving the fishing lines, the Troths realized that the current was pulling their boat towards the spillway. The small electric trolling motor was unable to resist the current and the boat was drawn closer to the spillway. Mr. Troth shifted to a position where he could start the ten-horsepower gas-driven motor. He tried several times but the motor would not turn over. As the boat approached the mouth of the spillway, Mrs. Troth saw "one wire rope which in large part was submerged beneath the water." She reached down and grabbed onto the cable, but was unable to prevent the boat from being swept over the crest of the spillway. Both Marie and Floyd Troth were thrown from the boat as it passed over the dam. As she was falling, Mrs. Troth saw the boat flip over and strike her

husband.  Mr. Troth drowned and Mrs. Troth suffered serious injury.

The Division of Fish, Game and Wildlife dispatched an investigator, who arrived soon after the accident.  The investigator, who was familiar with Union Lake, checked the water-depth gauge and found the water level to be above normal.  The investigator found a single safety cable stretched across the spillway.  He also noted that there was "higher than normal water and a strong current was evident."  The investigator also observed two signs facing the lake on either side of the spillway bearing the legend "KEEP AWAY."

In preparation for this litigation, plaintiff retained an engineering expert to furnish a report on the safety of Union Lake Dam.  According to that report, the spillway has a maximum discharge capacity of 19,000 cubic feet of water per second.  At capacity, the water depth across the 200–foot length of the spillway is 6.5 feet.  At this level, the water velocity at the crest of the spillway is 14.5 feet per second.  The report observes that "[a] small boat cannot be controlled at such a rate of flow."  At half-capacity, water depth at the spillway is 4.1 feet and has a velocity at the crest of 11.5 feet per second, a flow that the report indicates "would still result in a velocity uncontrollable in a small boat."

From these flow velocities, plaintiff's expert concluded:

The velocities calculated above are those that would exist at the spillway crest. At locations in the reservoir, at some distance from the spillway, the velocities would be much diminished, but a current toward the spillway would still exist. This situation represents an insidious trap for a boat could begin a gentle drift, with its occupants unaware of the motion, until it had accelerated to the point where escape from the grip of the current became impossible.

Plaintiff's engineering expert inspected the dam in February 1985.  At that time, two wire-rope barriers were stretched across the crest of the spillway.  The engineering report indicates that at full discharge capacity the spillway-wire barrier would be completely submerged over its entire length; at half capacity, the barrier would be submerged over most of its

length. The report concluded that a floating-barrier boom would have been a more effective safety measure.

Plaintiff's report summarizes its findings as follows:

a) The unrestricted use of Union Lake by small boats, together with the flow of water from the lake over the dam spillway, constituted a very dangerous condition.

b) The State of New Jersey had actual notice of the existence of this dangerous condition, as evidenced by the placement of the warning signs and a wire rope barrier at the spillway.

c) Warning signs placed only on the dam itself were totally inadequate.

d) Barriers which a small boat could pass under at low flows, and which would be submerged at high flows, were defective.

e) Other appropriate measures were available to provide more complete protection to the boating public.

Plaintiff's engineering report incorporates an earlier engineering report prepared for the State of New Jersey by the United States Army Corps of Engineers. This report was prepared pursuant to the National Dam Inspection Act, 33 *U.S.C.A.* § 467a, and transmitted to the Governor in September 1978. The report concluded that Union Lake Dam is "a high hazard potential structure."[1] In particular, the Corps of Engineers found that the "spillway is considered to be inadequate since 61% of the Probable Maximum Flood [ ] would overtop the dam." The report recommended that the State promptly institute a number of safety measures: an engineering study of the

---

[1]"High hazard" is a classification given to dams posing serious threat to public safety:

Dams impounding large reservoirs on principal rivers with high runoff potential should unquestionably be considered to be in the high-hazard category. For such developments, conservative design criteria should be selected because failure could involve the loss of life or damages of disastrous proportions. Conversely, small dams built on isolated streams in rural areas where failure would neither jeopardize human life nor create damages beyond the sponsor's financial capabilities may be considered to be in a low-hazard category. [Bureau of Reclamation, U.S. Dep't of the Interior, *Design of Small Dams* 339–40 (3d ed. 1987).]

The federal government has rated ninety-one publicly-owned and ninety-six privately-owned New Jersey dams as "high-hazard" structures. *The Star Ledger,* May 10, 1989, at 1, col. 1.

spillway and implementation of necessary remedial actions to insure its adequacy and prevent overtopping; installation of an interim system notifying local civil defense authorities of dangerous conditions during heavy storms; providing spillway-gate operators with flow information and water elevations; and installation of a gauge to record reservoir levels during peak flows.

With respect to the State's failure to implement the recommended safety measures, the plaintiff's expert concludes:

Unless sufficient explanation can be provided for disregarding the recommendations contained in the Berger [Army Corps of Engineers] report, and we can hardly conceive any, a valid theory can be developed for wanton disregard for safety provisions at the site. Lack of concern for safety of the dam system itself during high flow conditions would naturally foster a more casual attitude toward boaters during these same conditions. Regular users of Union Lake, who have operated their boats safely in the vicinity of the dam during low-flow periods, could be lulled into a sense of security that would be unwarranted at higher flows (and hence more rapid velocities near the dam). The owners and operators of the dam, having been alerted to high-flow hazards, should have responded with more effective safety and warning devices * * *.

The State moved for summary judgment, contending that it was immune from liability under the New Jersey Tort Claims Act because Union Lake was "unimproved public property," *N.J.S.A.* 59:4–8 and –9. It argued in the alternative that it was entitled to immunity under the Landowner Liability Act, *N.J. S.A.* 2A:42A–1 to –7, asserting that it owed no duty to people using Union Lake for "sport and recreational activities." *N.J. S.A.* 2A:42A–3. After the Law Division denied the summary judgment motion, the Appellate Division granted the State leave to appeal. In her responding brief, plaintiff argued for the first time that summary judgment should be denied because of a factual issue over whether the State's employees had been negligent in supervising the recreational use of Union Lake. See *N.J.S.A.* 59:3–11.

The Appellate Division reversed, concluding that the State's immunity from liability for injuries caused by a dangerous condition of "unimproved public property" compelled the grant of summary judgment.

> We are satisfied there is no factual issue as to whether Union Lake as part of the larger tract acquired by the State for conservation and recreational purposes is "unimproved public property" within the meaning of *N.J.S.A.* 59:4–8. Nor, that the existence of the earthen dam and concrete spillway, although an artifically created structure, causes the nature of this property to be other than unimproved. This conclusion is compelled by legislative directive that "the term unimproved public property should be liberally construed." Comment to *N.J.S.A.* 59:4–8 and 9, *supra.* Clearly, the dam is a necessary and integral part of the lake and thus cannot be considered, as urged by plaintiffs, as a separate and distinct parcel of the State-owned land having no relationship to the unimproved aspect of the entire tract. In comparing the nature and extent of this man-made improvement with the nature and extent of the lake itself it is evident that the existence of the dam cannot detract from the overall unimproved character of this portion of the Union Lake Wildlife Management Area. [222 *N.J.Super.* at 425–26.]

The Appellate Division also determined that there was no factual issue raised by plaintiff's contention that the State's liability could be premised on the negligent supervision of boating activity by State employees. The court acknowledged that State conservation officers routinely patrolled the lake for the purpose of enforcing fish and game laws, and also periodically inspected the dam and spillway. *Id.* at 425. The court concluded that there was

> no proof that State employees undertook the supervision of the recreational use of the lake. The routine patrols of the conservation officers were directed to enforcement of the applicable laws and regulations. Their inspection of the spillway, being "an incidental undertaking at the same place and only tangentially related to the recreational activity." *N.J.S.A.* 59:3–11. [*Id.* at 427.]

The Appellate Division did not address the State's contention that it was also afforded immunity under the Landowner's Liability Act. *Id.* at 422.

## II.

Because this action is predicated on the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, our analysis begins with the Act's relevant provisions and with the comments of the Attorney General's Task Force Report (Task Force Report), which provide the legislative history for the Act. J.S. Fitzpatrick, *Governmental Tort Liability in New Jersey* 17 (1986) (Fitzpatrick). As a general rule, the analytical "approach

should be *whether an immunity applies and if not, should liability attach." N.J.S.A.* 59:2-1, comment. By providing that " 'public entities are immune from liability unless they are declared to be liable by an enactment,' " the Legislature intended to " 'provide a better basis upon which the financial burden of liability may be calculated, since each enactment imposing liability can be evaluated in terms of the potential cost of such liability.' " *Ibid.* (quoting California Law Revision Comm'n, Recommendations Relating to Sovereign Immunity 811 (1963)).

Consistent with that general policy, two sections of the Act, *N.J.S.A.* 59:4-8 and -9, limit liability of public entities for injuries on unimproved property. A third section precludes liability for the failure to supervise, but not for negligent supervision. *N.J.S.A.* 59:3-11. The two sections pertaining to unimproved property provide:

> Neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach. [*N.J.S.A.* 59:4-8.]
>
> Neither a public entity nor a public employee is liable for any injury caused by a condition of the unimproved and unoccupied portions of the tidelands and submerged lands, and the beds of navigable rivers, streams, lakes, bays, estuaries, inlets and straits owned by the State. [*N.J.S.A.* 59:4-9.]

When explaining the purpose of these two sections, the Attorney General's Task Force commented:

> Sections 59:4-8 and 59:4-9 reflect the policy determination that it is desirable to permit the members of the public to use public property in its natural condition and that the burdens and expenses of putting such property in a safe condition as well as the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property to assume the risk of injuries arising therefrom as part of the price to be paid for benefits received. A similar statutory approach was taken by the California Legislature. [*N.J.S.A.* 59:4-9, comment (citations omitted).]

After pointing out that "[t]he State of New Jersey possesses thousands of acres of land set aside for the specific purpose of recreation and enjoyment," the comment concluded:

> The exposure to hazard and risk involved is readily apparent when considering all the recreational and conservation uses made by the public generally of the

foregoing acreages, both land and water oriented. Thus in sections 59:4–8 and 59:4–9 a public entity is provided an absolute immunity irrespective of whether a particular condition is a dangerous one.

In addition it is intended under those sections that the term unimproved public property should be liberally construed and determined by comparing the nature and extent of the improvement with the nature and extent of the land. Certain improvements may be desirable and public entities should not be unreasonably deterred from making them by the threat of tort liability. [*Ibid.*]

Although we have not previously construed *N.J.S.A.* 59:4–8 and –9, the Law Division and the Appellate Division have arrived at conflicting constructions of the sections. The Law Division has construed *N.J.S.A.* 59:4–8 to provide immunity only for "natural conditions." *Diodata v. Camden County Park Comm'n,* 162 *N.J.Super.* 275, 289 (1978). In *Diodata,* the court determined that a park commission would not be immune from liability because a submerged oil drum that a diver struck when he dived into a river was not a "natural" condition. *Ibid.* During that same year, the Law Division also held that a municipality would not be immune from liability to a swimmer who was injured by a body surfer, finding that the presence of the surfer in the waves was no more a natural condition than an oil drum in a river. *Kleinke v. City of Ocean City,* 163 *N.J.Super.* 424 (1978), *overruled on other grounds, Sharra v. City of Atlantic City,* 199 *N.J.Super.* 535 (App.Div. 1985).

In contrast, the Appellate Division has rejected the contention that the State's immunity is limited to injuries caused by "natural" conditions. In *Freitag v. Morris County,* 177 *N.J. Super.* 234 (1981), the Appellate Division granted summary judgment in favor of the county for injuries sustained by the plaintiff in a tobogganing accident on a county recreation area. Half of the area contained a golf course, and the other half was woodlands and open fields. The hills on which plaintiffs were tobogganing had been cleared of rocks, which had been placed alongside the hill. Plaintiffs lost control of their toboggan and crashed into the rocks. Plaintiffs contended that because the row of rocks was placed there when the hill was cleared, their

injury was not attributable to a "natural" condition. The court held that the hill had not lost its unimproved character merely because it had been cleared, and that the county was immune from liability. The Appellate Division observed that the Law Division in *Diodata, supra,* had incorrectly relied on interpretations of California's immunity statute, which confers immunity only when an injury is caused by a "natural condition of any unimproved public property," noting that *N.J.S.A.* 59:4–8 affords immunity for injuries caused by *any* condition of unimproved public property. *Id.* at 238 (quoting *Cal. Gov't Code* § 831.2 (West)).

Accordingly, the *Freitag* court concluded that the determinative question in deciding

> the applicability of *N.J.S.A.* 59:4–8 is whether the property is unimproved. Whether the injury was caused by a natural or "artificial" hazard would be relevant only insofar as it aids the court in determining the nature of the property. This approach more realistically implements the Legislature's intention to encourage public entities to permit citizens to use unimproved public property by immunizing the public entity from tort liability. A public entity should not have to expend tax money to make unimproved property safe, even if such property has dangerous artificial conditions. *Liability might attach if the public entity decides to improve the property, the rationale being that once substantial sums are expended to improve property it is not unreasonable to require the expenditure of lesser sums for safe maintenance, including the removal of hazardous artificial or natural conditions.* [*Id.* at 238–89 (emphasis added).]

Professor Arvo Van Alstyne, who served as a consultant to the Commission that drafted the California Tort Claims Act of 1963, *Cal. Gov't Code* §§ 810 to 946, and to the New Jersey Attorney General's Task Force on Sovereign Immunity, offers an analysis similar to that of the Appellate Division in *Freitag.* He observes that property loses its "unimproved" status when there is "some form of physical change in the condition of the property at the location of the injury, which justifies the conclusion that the public entity is responsible for reasonable risk management in that area." A. Van Alstyne, *California Government Tort Liability Practice* § 3.42 (1980) (hereinafter Van Alstyne).

The California courts offer an additional clarification of the term "unimproved public property." Under their rulings, an improvement of a portion of public property does not remove the immunity from the unimproved areas. *Geffen v. County of Los Angeles,* 197 *Cal.App.* 3d 188, 192, 242 *Cal.Rptr.* 492, 496 (1987); *Rendak v. State,* 18 *Cal.App.* 3d 286, 288, 95 *Cal.Rptr.* 665, 667 (1971); *accord Fuller v. State,* 51 *Cal.App.* 3d 926, 932, 125 *Cal.Rptr.* 586, 592 (1975). As the California Court of Appeals observed in *Rendak v. State, supra:*

> Appellants' argument would demolish the immunity as to an entire park area improved in any way * * *. An entrance gate, a parking area adjoining it, or residential provision for park employees would wholly destroy the immunity. * * * It follows that improvement of a portion of a park area does not remove the immunity from the unimproved areas. [18 *Cal.App.* 3d at 288, 95 *Cal. Rptr.* at 667.]

Thus, under the California decisions, a holding that the Union Lake Dam is "improved" public property would not foreclose the statutory immunity from applying to Union Lake and the balance of the 4,300–acre preserve.

We note, however, that the Appellate Division apparently assumed that the entire tract had to be viewed as a unit, thereby precluding the court from treating the dam as an improvement while simultaneously preserving the "unimproved" character of the remaining acreage.

> Clearly, the dam is a necessary and integral part of the lake and thus cannot be considered, as urged by plaintiffs, as a separate and distinct parcel of the State-owned land having no relationship to the unimproved aspect of the entire tract. In comparing the nature and extent of this man-made improvement with the nature and extent of the lake itself it is evident that the existence of the dam cannot detract from the overall unimproved character of this portion of the Union Lake Wildlife Management Area. [222 *N.J.* at 426.]

## III.

In the context of the public policies underlying the statutory immunity for unimproved public property, it is not difficult to identify the factors that determine when property is improved to an extent sufficient to eliminate the immunity. Public property is no longer "unimproved" when there has been substan-

tial physical modification of the property from its natural state, and when the physical change creates hazards that did not previously exist and that require management by the public entity. *See* Van Alstyne, *supra*, at § 3.42; *Freitag, supra*, 177 *N.J.Super.* 234. Obviously, in order for liability to be imposed on the public entity there must be a causal connection between the "improvement" and the alleged injury. *Cf. Keyes v. Santa Clara Water Dist.*, 128 *Cal.App.* 3d 882, 180 *Cal.Rptr.* 586 (1982) (where plaintiff struck submerged object while swimming in man-made lake created by dam, public entity retains immunity based on unimproved public property in absence of causal nexus between dam and hazardous condition that caused injury).

Whether the improvement was made before or after the property was acquired by the public entity should be of no consequence in determining the applicability of the immunity. Had the State constructed Union Lake Dam *after* it acquired this wildlife-recreational area in 1982, the State undoubtedly would acknowledge that the dam was an improvement it was obligated to maintain.

Union Lake Dam, although built long before the State acquired the tract in question, constitutes a substantial physical modification of the property's natural condition. Over 2,000 feet long, with a 200–foot wide spillway, the dam impounds the Maurice River and creates Union Lake. It would be a contradiction in terms to characterize this dam as "unimproved" public property.

More to the point, as confirmed by the technical manuals on dam construction and safety, dam spillways pose special hazards to recreational boaters, as well as to downstream property owners, who risk flood damage in the event of spillway failure. See Bureau of Reclamation, U.S. Dep't of the Interior, *Design of Small Dams* 507 (3d ed. 1987) ("Logbooms or boatbooms should be maintained upstream of the spillway inlet channel to prevent plugging of the spillway and to keep boats from

entering the spillway." ); 3 J. Justin, J. Hinds & W. Creager, *Engineering for Dams* 663 (1945) ("An earth dam should be designed with the spillway capacity so great that there is no danger of overtopping * * *. Many earth dams are in use that have spillways of insufficient capacity to care for floods, which are certain to come sooner or later."). History also provides examples. See *Torrent of History,* N.Y. Times, May 31, 1989, at A22, col. 1 (recounting the failure on May 31, 1889, of an earthen dam on South Fork Creek outside of Johnstown, Pennsylvania, which unleashed "a torrent that swept away 2,209 lives" and is regarded as "the worst such disaster in U.S. history," and further recounting the view expressed by the editor of the Johnstown Tribune: "We think we know what struck us, and it was not the hand of Providence. Our misery is the work of man."). In addition, a number of reported federal-court decisions illustrate the hazard posed to boaters by dam spillways. *See, e.g., James v. United States,* 760 *F.*2d 590 (5th Cir.1985); *Dye v. United States,* 210 *F.*2d 123 (6th Cir. 1954); *Empire Dist. Elec. Co. v. Rupert,* 199 *F.*2d 941 (8th Cir.1952); *Clark v. Tennessee Valley Auth.,* 606 *F.Supp.* 130 (N.D.Ala.1985); *Russell v. Tennessee Valley Auth.,* 564 *F.Supp.* 1043 (N.D.Ala.1983).

Thus, to the extent that the degree of hazard posed by a physical alteration of property is material to a determination whether that alteration should be classified as "improved" property, it is apparent that large dams pose a hazard to safety sufficient to require a public entity to assume responsibility for their operation and maintenance. Plaintiff alleges in her complaint and affidavits opposing summary judgment that because of the configuration of the Union Lake Dam spillway, at high-water levels the flow velocity near the spillway created a "dangerous condition" for small fishing boats. It remains to be seen whether plaintiff can prove her contentions at trial. It is self-evident, however, that the "dangerous" condition of the spillway that allegedly caused the injuries in this case would not have existed had the dam not been built, and assuming its

existence, it is the type of hazard that warrants management and remediation by the responsible public entity. Despite the State's assertion of immunity in this litigation, it is highly unlikely that State officials assumed that the State could have acquired this 4,300–acre wildlife preserve without assuming complete responsibility for maintenance, hazard-control, and the structural integrity of Union Lake Dam. In answers to interrogatories the State acknowledged that it made comprehensive semi-annual inspections of the dam and twice-daily inspections of the spillway during the summer.

We therefore conclude, in the context of the State's summary-judgment motion and the plaintiff's responsive allegations, that Union Lake Dam is not unimproved public property. Hence, the State is not immunized from liability if plaintiff presents evidence that the dam and its spillway constituted a "dangerous condition" and that otherwise meets the requirements of *N.J.S.A.* 59:4–2. Moreover, our determination that the Act's unimproved-property immunity does not apply to the dam itself is entirely compatible with the legislature's avowed purpose of encouraging the public to use unimproved recreational property at its own risk. Consistent with the legislature's objectives, we specifically adopt the holding of the California cases that recognize that public property may be partly improved and partly unimproved. *Supra* at 269. Thus, our holding that Union Lake Dam is "improved" property would not foreclose the statutory immunity from applying to Union Lake and the balance of the 4,300–acre preserve.

### IV.

As previously noted, plaintiff first raised the issue of negligent supervision of boating activities by State employees in her brief opposing the State's motion for leave to appeal, although no such allegations appear in the complaint. Notwithstanding this procedural irregularity, the Appellate Division observed that "the routine patrols of the conservation officers

were directed to enforcement of the applicable laws and regulations," concluding that there was no proof in this record "that State employees undertook the supervision of the recreational use of the lake." 222 *N.J.Super.* at 427. The controlling principle is that a public entity is not liable for the failure to supervise, but only for negligent supervision. Consequently, a public entity does not lose its immunity without some employee conduct,

> no matter how minute, evidencing an intention to supervise by way of monitoring, entering into or becoming a part of the activity itself from which the injury sprang. Liability for negligent supervision will not be imposed simply because there was an incidental undertaking at the same place only tangentially related to the recreational activity. [*Morris v. City of Jersey City*, 179 *N.J.Super.* 460, 464 (App.Div.1981).]

Given the procedural posture in which this issue is presented, we consider it to be inappropriate for summary disposition. The claim of negligent supervision was not alleged in the complaint and was only tangentially developed in the abbreviated record before us. Its eventual resolution by the trial court on a more developed record would better serve the interests of justice.

As noted, the Appellate Division made no determination concerning the applicability of the Landowner's Liability Act, *N.J. S.A.* 2A:42A–1 to –7. Although the issue was raised in the petition for certification, the State did not address it on the assumption that the question was not before us. We express no view on its application to these facts.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division.

HANDLER, J., concurring.

I agree with the Court's opinion that the Union Lake Dam should not be considered "unimproved property" within the immunity provisions of *N.J.S.A.* 59:4–8 and –9. The necessity for ongoing management and regular maintenance and the special risks engendered by such structures, unique in their

potential for fatal consequences, compel a determination that the State shall not be immune from liability when its conduct is "palpably unreasonable" with regard to a "dangerous condition" of such structures as the Union Lake Dam.

I would note further that these special and peculiar risks implicate the supervisory responsibility of State-government officials, otherwise entrusted with the care and maintenance of these dams, which would encompass the manner in which members of the public come into contact with the dam and are permitted to use it. This surely would include responsibility for the recreational activities that are made available to the public in connection with the dam, as well as the public's safety in engaging in these activities. Consequently, the conduct of officials in the discharge of that responsibility would fall within the statutory intendment of "supervision" under the provisions of *N.J.S.A.* 59:3–11.

I appreciate that the pleadings and the record of the case do not adequately present the issue of negligent supervision. But the issue is clearly relevant in light of the determination to remand the case for a retrial. It is, therefore, not amiss to observe that the evidence of record, although not fully developed, suggests that there is a supervisory obligation on the part of the government officers and employees responsible for inspecting the dam and surrounding area that extends to the recreational activities taking place on the dam, including the safety of persons engaging in those activities.

It may be that general policing activities, involving only law and regulatory enforcement over fishing, do not constitute supervision for the purpose of *N.J.S.A.* 59:3–11. Arguably such supervision may not be demonstrated only by knowledge of conservation officers that people fished near the dam coupled with an awareness of the dangers entailed in that activity. *See Morris v. Jersey City,* 179 *N.J.Super.* 460 (App.Div.1981). However, while the mere presence or absence of supervisory and regulatory personnel alone probably does not equate with

supervision, it is at least debatable whether the enforcement of the regulations governing fishing, which occurred at Union Lake, does not also encompass responsibility for the safety of fishermen.

Moreover, the facts may be taken to indicate more than mere awareness on the part of government employees that people were fishing in the vicinity of the dam and that such activity could be dangerous. Affirmative and direct steps were taken with respect to these activities. Thus, the government employees took specific measures to alert those members of the public using the spillway area about its hazards. Two warning signs bearing the legend "Danger, Keep Away" were posted facing the lake on either side of the spillway; a safety cable was erected, stretching across the spillway approximately twenty-five feet in front of the dam; and the inspection of the lake and area surrounding the spillway by state conservation officers was increased to twice a day during the summer months, presumably because of the increased recreational use of this area. It is reasonably inferable that these supervisory measures and safety precautions were designed to ensure not only the integrity of the structure but the safety of persons engaged in activities involving the use of the dam. These considerations might confirm the view that the State has undertaken to supervise the safety of those engaged in the recreational use of the dam. *Morris, supra,* 179 *N.J.Super.* at 464 ("A public entity does not lose its immunity without some employee conduct, *no matter how minute,* evidencing an intention to supervise by way of *monitoring,* entering into or becoming a part of the activity itself from which the injury sprang.") (emphasis added).

Whether preventive and cautionary measures taken by the State officials were sufficient to fulfill their responsibility to the public is an issue that plaintiff should have the opportunity to address and a jury determine. The unique risks posed by structures such as the Union Lake Dam, in combination with the facts of this case, which strongly indicate that the State has

undertaken to supervise the safety of those engaged in the recreational use of the dam and may have done so negligently, lead me to conclude that plaintiff, in addition to being permitted the opportunity to prove that the death of her husband and her own personal injuries were the result of the State's "palpably unreasonable" conduct with regard to a "dangerous condition of its public property," *N.J.S.A.* 59:4–2, should also be permitted to prove that such injuries were the product of negligent supervision by government employees in accordance with *N.J. S.A.* 59:3–11.

O'HERN, J., concurring.

I concur in the opinion and judgment of the Court. I add these observations because of some reservation about what may be perceived as the extent of its holding.

The case concerns the liability of the State for a boating accident that occurred on a man-made lake. The statute sounds simple enough: public entities are not liable for injuries caused by "a condition of any unimproved public property * * *." *N.J.S.A.* 59:4–8. This statutory definition begs the underlying question of what caused the accident.

The ordinary person looking at this case would conclude that the terrible tragedy occurred because the auxiliary outboard motor of the fishing party failed to start. Nonetheless, we must look at possible concurrent causes of the tragedy. Causation sounds simple, but

[a]s every freshman student of tort law soon learns to his discomfort, "causation" is an inscrutably vague notion, susceptible to endless philosophical argument, as well as practical manipulation.

[Robinson, "Multiple Causation in Tort Law: Reflections on the DES Cases," 68 *Va.L.Rev.* 713, 713 (1982).]

We have been particularly candid to equate causation with issues of policy. *See People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246 (1985). It is not surprising, then, that both majority and dissent view the question of causation through different prisms of public policy. The dis-

sent says that (1) you could not have the lake without the dam; (2) the lake is surely unimproved property; and (3) since the lake would not exist without the dam, "[i]t follows that the dam, like the rest of the lake, should have the benefit of the immunity granted by the Legislature to unimproved property." *Post* at 283.

But that the improvement created the natural area does not necessarily immunize all aspects of the improvement, *i.e.*, the dam itself. For example, would the dissent reach the same result had the Troths been fishing from the dam and fallen from a slippery and cracked portion of the dam, of which dangerous condition the State had notice under *N.J.S.A.* 59:4-2b? I think not. On the other hand, I must agree with the dissent that the State does not become liable for a boating accident because it is a dam that has created a recreational waterway. But within these polar points are the allegations that an inadequate spillway created a hazard at the dam lip and that a faulty boom device failed to restrain the boat from the fall. As noted, the victim's wife reached for this wire rope but was unable to hold on to it.

Were these conditions of improved property that caused the injury? At this point we must review again the structure of the Tort Claims Act. In suits against a public entity, such as the Division of Fish, Game and Wildlife, plaintiffs alleging negligence must first establish the predicates for liability and later avoid application of any provision granting the sovereign immunity.

In this case, plaintiffs predicate their cause of action on the unsafe condition of public property. *N.J.S.A.* 59:4-2. Liability based on this provision requires a demonstration that (1) a dangerous condition of public property (2) proximately caused plaintiff's injury (3) in a way that was reasonably foreseeable (4) after the entity in charge of the property either had notice in time to protect against the condition or had created the condition through an employee acting within the scope of employ-

ment. *Brown v. Brown*, 86 *N.J.* 565, 575 (1981). Further, the agency's action or inaction must be palpably unreasonable. *Ibid.*

The key phrase, "dangerous condition," is defined in *N.J.S.A.* 59:4–1a:

"Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used.

A "substantial risk" giving rise to a dangerous condition is "one that is not minor, trivial or insignificant." *Polyard v. Terry*, 160 *N.J.Super.* 497, 509 (App.Div.1978), *aff'd o.b.*, 79 *N.J.* 547 (1979). A plaintiff must advance enough facts to enable a jury of reasonable people to find that the condition was dangerous. *Id.* at 510.

Once those predicates for liability have been met, a public entity may avail itself of certain immunities set forth in the Code. These are affirmative defenses on which defendant has the burden of proof. *Thompson v. Newark Housing Auth.*, 108 *N.J.* 525, 533 (1987). As noted, the immunity claimed here is granted to the public entity when an accident is caused by a condition of "unimproved public property." Each party approaches the issue of causation, then, from a different thesis, plaintiff alleging that the lack of an effective boom on the dam or an inadequate spillway caused the injury and defendant alleging that the natural waterway caused the injury.

Such subtle issues of causation have been particularly troublesome to this Court. *Kolitch v. Lindedahl*, 100 *N.J.* 485 (1985), illustrates the difficulty. In that case, the majority of the Court held that the legislative act of posting a 50 mph speed limit sign at a dangerous curve in the road could not constitute a dangerous condition of property. *Id.* at 495. The State relied on its statutory immunity when making legislative decisions with respect to speed limits. *N.J.S.A.* 59:2–3b ("A public entity is not liable for legislative * * * action * * *."). Justice Handler, in dissent, parsed the question of causation further. He said that it was too facile to regard the legislative act as

subsuming the ministerial act of placement of the sign. *Kolitch v. Lindedahl* at 512–14 (Handler, J., dissenting). In other words, it may have been appropriate to state at the entry to the roadway that the legal speed limit was 50 mph, but it was particularly inappropriate to place the sign at a dangerous curve in the road, thus suggesting that 50 mph was a "safe" speed.

In *Thompson v. Newark Housing Authority, supra,* 108 *N.J.* 525, the Court concluded that the statutory plan and design immunity did not relieve the defendant, as a matter of law of liability, for failure to provide smoke detectors in public housing projects. Yes, the project was built in accordance with plans, but the plans had never adverted to the condition asserted.

In short, these immunities are not self-executing, nor are they self-informing. I cannot agree that just because the lake is a natural area, an accident at the dam site is necessarily immunized. And, I must disagree with the conclusion in the majority opinion that because "the 'dangerous' condition * * * would not have existed had the dam not been built," it must be regarded as a condition of improved property. *Ante* at 271. That logic would apply as well if the allegation had involved upstream ice fishing and the plaintiff had fallen through the ice.

To sum up, the Union Lake recreation area is not "improved property." But that is not the total answer to this case. As I see it, the plaintiff alleges that particular features of a physical improvement to property, *i.e.,* the inadequate spillway or the defective boom, caused the injury. On these issues, I think that the plaintiff has presented at least triable issues of fact as to whether or not such were the cause of the injury as opposed to the rush of water of the lake itself, as the State contends by way of affirmative defense.

I am not at all certain that after the plaintiff has presented her proofs there will be a triable issue of fact as to whether the

State had notice of a dangerous condition with respect to the spillway that could be held to have caused the accident in a way that was reasonably foreseeable. *N.J.S.A.* 59:4-3. The notice to the State from the Army Corps of Engineers was concerned with one problem and one problem only, the danger to downstream residents and property owners from a collapse of the dam. Too swiftly flowing water might erode the earthen dam. Hence, the references to human disaster contained in the Army Corps of Engineers report are largely irrelevant to the circumstances of this case. Congress specifically directed the Army Corps of Engineers to make the studies beginning in 1972 as a result of downstream tragedies in Rapid City, South Dakota, and Buffalo Creek, West Virginia. Act of Aug. 8, 1972, P.L. No. 92-367, 86 Stat. 507 (codified as amended at 33 *U.S.C.* § 467); H.R.Rep. No. 92-1232, 92d Cong., 2d Sess. 1, *reprinted in* 1972 *U.S.Code Cong. & Admin. News* 2916. The Buffalo Creek Dam disaster killed 125 people and caused $50 million in damages. *Dam Safety: Hearings Before a Subcommittee on Government Operations,* 95th Cong., 1st Sess. 1 (1977) (statement of Hon. Leo J. Ryan, Chairman of Subcommittee). Hence 33 *U.S.C.* § 467c required the Army Corps to take into consideration "the possibility that the *dam* might be endangered by overtopping, * * * [or the failure of] gates on conduits, or other conditions which exist or which might occur in any area in the vicinity of the dam." (Emphasis added). The Army Corps gave notice to the State of potential failure of the dam, not danger to boaters.

But this is not the time to resolve trial issues. The plaintiff has the right to present her proofs on this issue and on the other issues presented in the case.

POLLOCK, J., dissenting.

Appellant Marie R. Troth was seriously injured and her husband was killed when they went over a dam in their boat. She sued the State of New Jersey, which owned the lake on which they had been fishing, for her husband's wrongful death,

*N.J.S.A.* 2A:31–1 to –6, and for her personal injuries. The Law Division denied the State's motion for summary judgment. The Appellate Division reversed, 222 *N.J.Super.* 420 (1988), holding that the State was immune for injuries caused by a condition of unimproved property, *id.* at 424–27, and by the absence of supervision, *id.* at 427. The majority reverses the judgment of the Appellate Division and remands the matter to the Law Division. I dissent.

–I–

I believe that the outcome of appellant's claims is determined by the unimproved nature of the property and by the absence of State supervision of fishing on the lake. A brief summary of the relevant facts serves to focus the analysis of those claims. Union Lake, which occupies approximately 850 acres of a 4,300–acre tract, is used for public recreation. The lake was created about 100 years ago by constructing an earthen dam to contain the Maurice River. The dam is 2,000–feet long, thirty-five-feet high, and has a 200–foot-wide concrete spillway. Facing the lake, on each side of the spillway, is a fourteen-inch by twenty-inch, white and red sign, warning "DANGER, KEEP AWAY." The word "DANGER" was painted four inches high, and the remaining words were eight inches high. In addition, a protective steel cable extended across the spillway in front of the dam.

In 1982, the State's Division of Wildlife Management acquired the property and designated it as a wildlife-management area. *N.J.A.C.* 7:25–2.18. A boat ramp in Union Lake Park, which is owned by the City of Millville, provides access to the lake. Although residential dwellings abut portions of the lake, none of those dwellings is in the vicinity of the dam. In sum, the State has left the property unimproved. State conservation officers patrol the lake and the surrounding area to enforce fish and game laws. From mid-June to Labor Day, they inspect the lake and the spillway twice each day.

A heavy rainfall on June 20, 1983, the day before the accident, had increased both the level of the lake and the flow over the spillway. On the day of the accident, Mr. and Mrs. Troth were trolling from a small boat when their fishing lines became snagged on a submerged tree trunk. As they moved toward the point of the snag, they drifted towards the spillway. The trolling motor was insufficient to withstand the current, and Mr. Troth unsuccessfully tried to start a larger motor. Mrs. Troth grabbed the steel cable, but the boat, with both her and Mr. Troth in it, went over the spillway.

–II–

The critical consideration in determining whether the State is immune from liability is not whether the condition giving rise to the injury is artificial or natural, but whether the State-owned property is improved or unimproved. I arrive at that conclusion from my analysis of the words and legislative history of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3 (the Act). With a significant exception, the Act was patterned after the California Tort Claims Act. *Fuchilla v. Layman,* 109 *N.J.* 319, 331 (1988); see *Comment,* §§ 59:4–8 and –9. The California statute, on which *N.J.S.A.* 59:4–8 is based, provides that

[n]either a public entity nor a public employee is liable for an injury caused by a *natural* condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach.
[*Cal. Gov't Code* § 831.2 (West 1988) (emphasis added).]

The New Jersey Legislature deleted the word "natural" from the relevant section of the statute, *N.J.S.A.* 59:4–8. By making that deletion, the Legislature manifested its intent not to restrict immunity to injuries arising out of public property in its natural condition. See N. Singer, 2A *Sutherland Statutory Construction* § 45.12 at 55 (Sands 4th ed. 1984). Thus, the test for State immunity is, as the Act mandates and as the majority implicitly acknowledges, *ante* at 267–269, whether the property is unimproved. That conclusion comports with the legislative concern that fear of liability might "cause many public entities

to close such areas to public use." *Comment,* §§ 59:4–8 and –9; see J.S. Fitzpatrick, *Governmental Tort Liability in New Jersey* 127 (1986). Consistent with that analysis, the Appellate Division has held, in a case embraced by the majority, *ante* at 267–269, that the determinative question is not whether property is in its natural condition, but whether it is unimproved. *Freitag v. Morris County,* 177 *N.J.Super.* 234, 238 (1981). Thus, an artificial condition does not deprive property of its unimproved character.

In analyzing whether Union Lake, including its dam, is unimproved property, I take my lead from the legislative direction that the term "unimproved" should be liberally construed. *Comment,* §§ 59:4–8 and –9. The Legislature has directed that in determining whether public property is unimproved, courts should compare "the nature and extent of the improvement with the nature and extent of the land." *Ibid.* The majority does not dispute that the lake is unimproved. Instead, the majority views the dam as something separate from the lake and concludes that it constitutes an improvement that falls outside the exemption from liability. In this regard, the Appellate Division declared:

> In comparing the nature and extent of this man-made improvement with the nature and extent of the lake itself it is evident that the existence of the dam cannot detract from the overall unimproved character of this portion of the Union Lake Wildlife Management Area. * * * [T]hat this body of water was created by the damming of the Maurice River is not a basis to distinguish it from a naturally formed lake in terms of the legislative intent to encourage recreational use of public acreages, both land and water oriented. [222 *N.J.Super.* at 426.]

I agree. The point is that the lake would not exist without the dam. It follows that the dam, like the rest of the lake, should have the benefit of the immunity granted by the Legislature to unimproved property. In asserting that "the 'dangerous' condition of the spillway that allegedly caused the injuries in this case would not have existed had the dam not been built," *ante* at 271, the majority fails to perceive that without the dam there would be no lake. The same flaw inheres in the majori-

ty's characterization of the dam as a partial improvement. *Ante* at 272. The dam is not a mere improvement; it is an integral part of the lake. Only by according the dam the immunity enjoyed by the lake can the Court honor the legislative direction that "it is not unreasonable to expect persons who voluntarily use unimproved public property to assume the risk of injuries arising therefrom as part of the price to be paid for benefits received." *Comment*, §§ 59:4–8 and –9.

The risk created by the flow of water over the spillway is like other risks encountered by boaters on other bodies of water, such as the flow of water over naturally-created dams or waterfalls. In either case, the legislative purpose is to encourage use of recreational facilities by protecting public entities from unreasonable expenses of putting property in safe condition or of defending claims for injuries. Insofar as the State's entitlement to immunity is concerned, it makes no difference whether the dam is large or small, natural or artificial, as long as the area is unimproved.

The majority concludes, however, that in analyzing the unimproved character of the property, the focus should be on whether "there has been substantial physical modification of the property from its natural state, and when the physical change creates hazards that did not previously exist and that require management by the public entity." *Ante* at 269–270. That test has no support in the words or legislative history of the Tort Claims Act. Finding no support in New Jersey, the majority relies on three decisions of the California courts, in each of which recovery was denied to the injured party. *Ante* at 269. One decision not discussed by the majority, *Osgood v. County of Shasta*, 50 *Cal.App.* 3d 586, 590–91, 123 *Cal.Rptr.* 442, 444–45 (1975), holds that the shoreline of a man-made lake is a natural condition that immunized the defendant county from liability when a water skier was struck and killed by a motorboat on the lake. I believe that the shoreline of a man-made lake is like the dam on Union Lake. Both the shoreline and the dam confine the water without which the lake

would not exist. Just as the California lake would not exist without the shoreline, Union Lake would not exist without the dam. And just as the California governmental entity was not responsible for the boating accident on its lake, the State should not be responsible for the accident on Union Lake.

Analogizing the Union Lake dam to the flood a hundred years ago in Johnstown, Pennsylvania, the majority finds the dam to be a dangerous condition. *Ante* at 270. Needless to say, the present case is not concerned with the risk of the dam's collapse. The record, moreover, is devoid of any evidence that anyone else has ever been injured at the dam. Indeed, the only evidence before us reveals that no one has been injured at the dam during the entire time that the State has owned it or during the preceding twenty years.

The basic flaw in the reasoning of the majority, however, is that it finds "that the degree of hazard posed by a physical alteration of property is material to a determination whether that alteration should be classified as 'improved' property * * *." *Ante* at 271. The New Jersey Legislature reached the opposite conclusion. It mandated that "a public entity is provided an absolute immunity irrespective of whether a particular condition is a dangerous one." *Comment,* §§ 59:4–8 and –9. In brief, the majority cannot support its suggested imposition of liability without substituting its own policy judgment for the one made by the Legislature.

Finally, the majority concludes that dams are so dangerous that the State should be deprived of immunity for this type of unimproved property. *Ante* at 272. Whatever merit lies in that argument should more appropriately be addressed to the Legislature.

For Justice O'Hern, the critical issue is not the unimproved nature of the lake, but causation. As he sees it,

the plaintiff alleges that particular features of a physical improvement to property, *i.e.,* the inadequate spillway or the defective boom, caused the injury. On these issues, I think that the plaintiff has presented at least triable issues of fact as to whether or not such were the cause of the injury as opposed to the

rush of water of the lake itself, as the State contends by way of affirmative defense. [*Ante* at 279.]

This analysis, I believe, stands the Act on its head. The Legislature has admonished that "the approach should be *whether an immunity applies and if not, should liability attach.* It is hoped that in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities." *Comment,* § 59:2-1. By recognizing the present cause of action, Justice O'Hern's concurring opinion flouts that clear legislative admonition. Because the lake, including the dam, is unimproved property, the State is immune no matter how the accident was caused.

–III–

The majority also allows appellant to proceed with her claim that the conservation officers were negligent in their supervision of the recreational use of Union Lake. She bases this claim on *N.J.S.A.* 59:3-11, which provides:

A public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility.

The principle underlying the statute is that a public entity should not be liable for the failure to supervise, but only for negligent supervision. As the majority acknowledges, *ante* at 273, a public entity does not lose its immunity without some employee conduct evidencing an intention to supervise the activity that gave rise to the injury. Liability should not be imposed simply because the government entity did something tangentially related to the recreational activity. *Morris v. City of Jersey City,* 179 *N.J.Super.* 460, 464 (App.Div.1981); *see Stempkowski v. Borough of Manasquan,* 208 *N.J.Super.* 328, 333 (App.Div.1986).

In the present case, neither the conservation officers nor any other State employees undertook to supervise the recreational use of Union Lake. Those employees were present to enforce fish and game laws. Policing activities do not constitute supervision for the purpose of *N.J.S.A.* 59:3-11. *Vanchieri v. New*

*Jersey Sports & Exposition Auth.*, 201 *N.J.Super.* 34, 41 (App.Div.1985), *rev'd on other grounds*, 104 *N.J.* 80 (1986). Thus, the issuance of summonses to unlicensed fishermen, as occasionally occurred at Union Lake, is not tantamount to assuming responsibility for the safety of fishermen. The record is devoid of any allegation that the conservation officers told appellant or her husband where to fish or in any way injected themselves into appellant's fishing expedition. In this tragic event, appellant and her husband were on their own.

As for the inspection of the integrity of the dam and spillway, on which Justice Handler relies, *ante* at 274–275, that activity was an incidental undertaking "tangentially related" to fishing. *Morris, supra,* 179 *N.J.Super.* at 464. Any such inspection was completely unrelated to appellant's accident; it did not constitute supervision of the activity that caused the accident. Neither the presence of conservation officers in the wildlife area, *ibid.*, nor their knowledge that people fished near the dam equates with supervision. If awareness of public use of unimproved property could constitute supervision, little, if anything, would be left of governmental immunity. Unimproved property may be hazardous and the hazards may be known to recreation or conservation officers. The Legislature intended, however, that members of the public who use unimproved property should assume the risks of injuries caused by the property's condition.

Here, the facts reveal an absence of supervision, not negligent supervision, by the State. As the Court has previously stated, the decision whether to supervise an activity is inherently a governmental decision to be made "free from the threat of tort liability." *Fahey v. City of Jersey City*, 52 *N.J.* 103, 110 (1968); *Stempkowski, supra,* 208 *N.J.Super.* at 333. In brief, the State did not supervise boating on the lake, and it should not be held responsible for appellant's claims.

I would affirm.

Justices CLIFFORD and GARIBALDI join in this opinion.

*Concurring in result*—Justices HANDLER and O'HERN—2.

*For affirmance*—Justices CLIFFORD, POLLOCK and GARIBALDI—3.

*For reversal and remand*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN and STEIN—4.