732 A.2d 1035

WILLIAM FLUEHR, PLAINTIFF–RESPONDENT, v. CITY OF
CAPE MAY, DEFENDANT–APPELLANT, AND JOHN DOE
AND COUNTY OF CAPE MAY, DEFENDANTS.

Argued April 28, 1998—Decided May 26, 1999.

*Gerald J. Corcoran* argued the cause for appellant (*Youngblood, Corcoran, Aleli, Lafferty, Stackhouse, Grossman & Gormley,* attorneys; *Mr. Corcoran, William L. Gormley* and *Phyllis Coletta,* on the brief).

*Gregory Marchesini* argued the cause for respondent (*Sandler & Marchesini,* attorneys; *Paul N. Sandler,* on the brief).

*Ronald E. Hoffman* submitted a brief on behalf of *amicus curiae* Ocean County Joint Insurance Fund (*Hiering, Hoffman and Gannon,* attorneys; *Mr. Hoffman* and *Michael J. McKenna,* on the brief).

*Stephen J. Foley, Jr.,* and *Philip G. Mylod* submitted a joint brief on behalf of *amici curiae* the New Jersey Chapters of Surfers' Environmental Alliance and Surfrider Foundation (*Campbell, Foley, Lee, Murphy & Cernigliaro,* attorneys for Surfers' Environmental Alliance and *Mr. Mylod,* attorney for Surfrider Foundation).

The opinion of the Court was delivered by

COLEMAN, J.

This is a sad case in which a bather broke his neck while swimming at a public beach on the New Jersey shore. The legal issues are whether the New Jersey Tort Claims Act's (TCA) immunity for unimproved public property, *N.J.S.A.* 59:4–8, applies to a claim filed by a surfer for injuries caused by a large wave while using an oceanfront beach, and whether the surfer's own conduct was the legal cause of his accident. The trial court held that the public entity has immunity. The Appellate Division in a published opinion disagreed and reversed. 303 *N.J.Super.* 481, 490–91, 697 *A.*2d 182 (1997). We granted certification, 152 *N.J.* 12, 702 *A.*2d 351 (1997), and now reverse. We hold that the surfer's conduct and the natural conditions of the ocean were the legal causes of the accident.

I

The Law Division decided the case on defendant City of Cape May's motion for summary judgment. We are therefore compelled to accept plaintiff's version of the facts and give plaintiff the benefit of all favorable inferences. *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.*2d 146 (1995); *Judson v. Peoples Bank & Trust Co.,* 17 *N.J.* 67, 110 *A.*2d 24 (1954). The underlying accident occurred on August 31, 1993, while plaintiff was bathing

in the ocean surf at First Avenue Beach, which was operated by the City of Cape May. Plaintiff, an experienced surfer, arrived at the beach at 10:00 a.m. and remained there until the accident occurred at 3:00 p.m. While surfing, plaintiff was struck by a number of large waves that tossed him about in the surf and caused him to strike his head on the ocean floor. Plaintiff suffered a severe spinal cord injury described as a broken neck.

On the day of plaintiff's injuries, Hurricane Emily was located off the coast of North Carolina. Due to the presence of the hurricane, the National Hurricane Center issued hurricane watches and warnings along the Eastern seaboard from North Carolina to Delaware. In a report prepared by Henry Berger, a recreation and sports consultant hired as an expert by plaintiff, Berger opined that the hurricane increased the size of the waves, the strength of the undertow, and the dangerousness of the ocean surf at First Avenue Beach on the day of plaintiff's accident. The parties are also in agreement that the "dangerous condition" giving rise to the alleged duty to warn or supervise was the "ocean conditions" caused by the presence of Hurricane Emily off the coast of North Carolina.

At the time of the accident, First Avenue Beach was patrolled by lifeguards employed by defendant City of Cape May. The Cape May Beach Patrol kept a daily log of the conditions at the beach. The log entry for August 31, 1993, described the surf conditions as "choppy" and the bathing conditions as "poor to fair." At the bottom of the log was written, "GUARDS CAUTION TO WATCH SURF [CONDITIONS]. UPDATES WILL BE GIVEN THROUGHOUT THE DAY ('EMILY')." Allan Pappas, one of the two lifeguards on duty at the time of plaintiff's accident, testified at a deposition that he did not recall seeing that report or receiving any updates on the hurricane.

In the same deposition, Pappas testified that, at the time of plaintiff's accident, Fred Lewis was the second lifeguard on duty at First Avenue Beach. Pappas also stated that after they were alerted that plaintiff had been injured, Lewis went to plaintiff's

aid. At that point, Pappas "pulled bathers out of the water" as a safety precaution because, with his partner preoccupied, he did not feel he could adequately monitor the entire beach by himself.

Lieutenant John Schellenger, the supervisor of the Cape May lifeguards at the time of plaintiff's accident, also was deposed. He testified that the duties of the lifeguards were to watch the beach and the bathers, and to monitor the conditions of the waves. He testified that Cape May did not have a flag system or loud speaker system to warn bathers of dangerous conditions. Pappas explained that although such systems were not in place, he nevertheless communicated with the bathers verbally and by using a whistle or hand signals.

Plaintiff's expert opined that it was reasonably foreseeable by Cape May beach management personnel that Hurricane Emily could result in dangerous and life-threatening conditions. He concluded that Cape May deviated from the proper standard of care by failing, under the circumstances, to have a procedure in place for warning bathers or closing the beach to bathers. Berger concluded that "[b]ut for these failures in the management of Cape May beaches for the safe protection of bathers, this incident and the serious injury sustained by William Fluehr were preventable."

In his complaint, plaintiff alleged claims against the City of Cape May for negligent supervision, failure to warn of the dangerous conditions posed by the ocean on the day of his accident, and failure to protect him from those hazards. The trial court granted the City of Cape May's motion for summary judgment on two grounds. First, the trial court held that the City was protected by the unimproved property immunity of the TCA, *N.J.S.A.* 59:4–8. *Fleuhr, supra,* 303 *N.J.Super.* at 483, 697 *A.*2d 182. Second, the trial court determined that the unimproved property immunity under *N.J.S.A.* 59:4–8 trumped the imposition of liability for negligent supervision provided under *N.J.S.A.* 59:3–11. *Id.* at 484, 697 *A.*2d 182.

The Appellate Division reversed. *Id.* at 481, 697 *A.*2d 182. It interpreted *Kleinke v. City of Ocean City,* 163 *N.J.Super.* 424, 394

A.2d 1257 (Law Div.1978), *overruled in part by Sharra v. City of Atlantic City,* 199 *N.J.Super.* 535, 489 A.2d 1252 (App.Div.1985), as holding that the unimproved property immunity did not override liability for negligent supervision of a public beach. *Fleuhr, supra,* 303 *N.J.Super.* at 487, 697 A.2d 182. Noting that it was not bound by federal cases interpreting the TCA, the Appellate Division also rejected the Third Circuit's interpretation of New Jersey law in *Kowalsky v. Long Beach Township,* 72 F.3d 385 (3d Cir.1995). *Fleuhr, supra,* 303 *N.J.Super.* at 488, 697 A.2d 182.

The Appellate Division held that a municipality has no obligation to make unimproved property safe. *Id.* at 488–89, 697 A.2d 182. It affirmed the order granting summary judgment in defendant's favor on plaintiff's claim that the ocean constituted a dangerous condition and that defendant had a duty to warn independent of its decision to provide lifeguards at the beach. *Id.* at 489, 697 A.2d 182. It distinguished, however, a public entity's decision not to provide protective services at a beach from a public entity's liability for negligent performance of those services once undertaken. *Ibid.* The Appellate Division stated that "recogni[zing] a cause of action for negligent performance of lifeguard services at a beach ... [would] avoid[ ] the anomalous result of imposing liability for negligent performance of lifeguard services at a municipal pool while immunizing the same actions due to the natural rather than artificial nature of the swimming hole." *Id.* at 490, 697 A.2d 182.

## II

Defendant City of Cape May presents a two-fold argument. First, it contends that the Appellate Division violated the basic rules for determining whether immunity exists under the TCA. It asserts that even if a valid claim has been alleged, and it contends that the claim in the instant action is not valid, the basic rule is that immunity prevails over liability. Second, defendant contends that the claim for negligent supervision or negligent provision of protective services must fail because a public entity cannot be held

liable for injuries caused exclusively by a wave, one of the naturally occurring forces of the ocean, based on the unimproved property immunity, *N.J.S.A.* 59:4–8.

Plaintiff concedes that both the trial court and the Appellate Division properly rejected his claim that the ocean constituted a dangerous condition on public property for which defendant had a duty to warn bathers independent of providing lifeguards. Plaintiff argues, however, that he should be permitted to pursue his claim for negligent supervision because defendant decided to provide lifeguard services. Unlike defendant's position, plaintiff and the Appellate Division focused upon the activity on the public property—the alleged failure of the lifeguards properly to supervise the beach—rather than on the condition of the public property itself.

*Amicus curiae* Ocean County Joint Insurance Fund (OC) argues that when both a liability and an immunity provision appear to apply to a TCA case, the immunity provision trumps the liability provision. OC observes that in other cases in which New Jersey courts have suggested that a negligent supervision claim could go forward, the unimproved property immunity was not at issue. OC maintains that in the present case the unimproved property immunity is directly implicated and, therefore, must trump the imposition of any liability under the TCA.

*Amici curiae* Surfers' Environmental Alliance–New Jersey (SEA–NJ) and Surfrider Foundation (collectively S & S) argue that the Appellate Division's decision is based on the fiction that a lifeguard could have taken action to prevent plaintiff's injury. S & S maintain that the action of the ocean, particularly the waves, cannot be predicted with any certainty in advance. For that reason, even the most vigilant lifeguards are not guarantors of the safety of those who venture into the ocean. S & S are concerned that, as a result of the Appellate Division's decision, municipalities will address the potential dangers of the ocean by restricting access to coastal waters, especially when the ocean is rough, thereby unduly limiting those who revel in the challenges present-

ed by rough, breaking seas. Alternatively, municipalities will remove lifeguards from the beach to avoid liability, thereby adversely affecting those people who prefer to bathe while protected by lifeguards.

### III

The determination of whether plaintiff should be permitted to proceed with his claim against the public entity that its lifeguards were negligent in their supervision of the beach in failing either to warn of the choppy surf conditions caused by Hurricane Emily or in failing to evacuate the beach entirely requires an analysis of several subsections of the TCA. *Troth v. State,* 117 *N.J.* 258, 265–66, 566 *A.*2d 515 (1989).

#### -A-

The TCA, *N.J.S.A.* 59:1–1 to 13–10, was enacted for the purpose of reestablishing the general rule immunizing public entities from liability for injuries to others. *Brooks v. Odom,* 150 *N.J.* 395, 402, 696 *A.*2d 619 (1997). It was not enacted for the purpose of creating liability. *Russo Farms, Inc. v. Vineland Bd. of Educ.,* 144 *N.J.* 84, 110, 675 *A.*2d 1077 (1996); *New Jersey Property–Liab. Ins. Guar. Ass'n v. State,* 195 *N.J.Super.* 4, 11, 477 *A.*2d 826 (App.Div.), *certif. denied,* 99 *N.J.* 188, 491 *A.*2d 691 (1984). Municipalities such as defendant fall within the purview of the TCA. *N.J.S.A.* 59:1–3 (defining "public entity" to include municipalities); *see Kemp ex rel. Wright v. State,* 147 *N.J.* 294, 309, 687 *A.*2d 715 (1997). Generally, immunity for public entities is the rule and liability is the exception. *N.J.S.A.* 59:2–1b; *Garrison v. Township of Middletown,* 154 *N.J.* 282, 286, 712 *A.*2d 1101 (1998); *Collins v. Union County Jail,* 150 *N.J.* 407, 413, 696 *A.*2d 625 (1997); *Kemp ex rel. Wright, supra,* 147 *N.J.* at 299, 687 *A.*2d 715; *Bombace v. City of Newark,* 125 *N.J.* 361, 372, 593 *A.*2d 335 (1991). In contrast, immunity of a public employee under the TCA is the exception. *Fielder v. Stonack,* 141 *N.J.* 101, 118, 661 *A.*2d 231 (1995). "Except as otherwise provided by [the TCA], a

public employee is liable for injuries caused by his act or omission to the same extent as a private person." *N.J.S.A.* 59:3–1a. Any immunity provided a public employee must be independent of a public entity's immunity under the TCA. The source of a public employee's immunity can be the TCA itself, *N.J.S.A.* 59:3–1b, or any other statute or common law. *Fielder, supra,* 141 *N.J.* at 118, 661 *A.*2d 231; *Chatman v. Hall,* 128 *N.J.* 394, 404–05, 608 *A.*2d 263 (1992).

-B-

*N.J.S.A.* 59:2–7 establishes a standard for determining whether a public entity may be liable for negligent supervision of a public recreational facility. It provides: "A public entity is not liable for failure to provide supervision of public recreational facilities; provided, however, that nothing in this section shall exonerate a public entity from liability for failure to protect against a dangerous condition as provided in [*N.J.S.A.* 59:4–1 to –9]." A separate relevant provision of the TCA deals with public employees. It provides: "A public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility." *N.J.S.A.* 59:3–11. Although both of those statutes are relevant to issues of liability, neither addresses the public entity's claim of immunity.

The City of Cape May contends that it is entitled to immunity pursuant to *N.J.S.A.* 59:4–8 and –9. The unimproved public property immunity provides:

> Neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach.

> [*N.J.S.A.* 59:4–8.]

Section 4–9, titled "Unimproved and unoccupied portions of certain lands—immunity," provides:

> Neither a public entity nor a public employee is liable for any injury caused by a condition of the unimproved and unoccupied portions of the tidelands and sub-

merged lands, and the beds of navigable rivers, streams, lakes, bays, estuaries, inlets and straits owned by the State.

[*N.J.S.A.* 59:4–9.]

The Comment on Sections 4–8 and 4–9 expresses the policy determination underlying the unimproved property immunity:

[I]t is desirable to permit the members of the public to use public property in its natural condition and that the burdens and expenses of putting such property in a safe condition as well as the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property to assume the risk of injuries arising therefrom as part of the price to be paid for benefits received.

[Comment on *N.J.S.A.* 59:4–9.]

The Comment also states:

The exposure to hazard and risk involved is readily apparent when considering all the recreational and conservation uses made by the public generally of the [approximately 915,000] acreages, both land and water oriented. Thus, in sections 59:4–8 and 59:4–9 a public entity is provided an absolute immunity irrespective of whether a particular condition is a dangerous one.

[*Ibid.*]

Plaintiff no longer contends that the oceanfront beach was improved property, which, if true, would have precluded the application of the unimproved property immunity. Plaintiff argues instead that the negligent supervision by the lifeguards in combination with the natural conditions of the ocean produced his injuries, and, therefore, any immunity under *N.J.S.A.* 59:4–8 and – 9 should not override liability. In rejecting that argument, the trial court relied on the Third Circuit's decision in *Kowalsky.*

In *Kowalsky,* the court granted summary judgment in favor of two municipalities that had been sued by bathers injured at a municipal beach by large waves created by Hurricane Gustav. 72 *F.*3d at 392. The *Kowalsky* court found that the public entities were immunized from the plaintiffs' claims under the unimproved property immunity of Section 4–8 and held that the ocean waves, which caused the plaintiffs' injuries, were natural conditions of unimproved property. *Id.* at 390. The *Kowalsky* court essentially found as a matter of law that the natural condition of the ocean

rather than any negligent supervision by lifeguards proximately caused plaintiff's injuries. The facts in the present case also allow us to dispose of the appeal on the theory of legal causation without reaching the merits of the immunity claim.

We note, however, that our TCA is patterned after the California Torts Claim Act. After *Gonzales v. City of San Diego,* 130 *Cal.App.*3d 882, 182 *Cal.Rptr.* 73 (1982), held that alleged negligent supervision of a public beach by lifeguards was not covered by California's unimproved public property immunity, the California Legislature in 1987 overturned that decision by enacting *Cal. Gov.Code* § 831.21. That statutory amendment essentially provides that the presence or absence of lifeguards or signs does not alter the absolute immunity provided for unimproved public property. Cases involving accidents that predated the amendment have criticized *Gonzales* severely. *See, e.g., Morin v. County of Los Angeles,* 215 *Cal.App.*3d 184, 263 *Cal.Rptr.* 479, 483–85 (1989) (stating that *Gonzales* "represents an unwarranted restriction of sovereign immunity and should not be followed"); *Rombalski v. City of Laguna Beach,* 213 *Cal.App.*3d 842, 261 *Cal.Rptr.* 820, 828–33 (1989) (Crosby, Acting P.J., concurring) (stating hybrid theory of *Gonzales* is unsound and unnecessary); *Geffen v. County of Los Angeles,* 197 *Cal.App.*3d 188, 242 *Cal.Rptr.* 492, 494–95 (1987) (stating *Gonzales* hybrid condition rationale is directly inconsistent with the plain meaning of *Cal. Gov.Code* § 831.2).

Since 1987, California courts, like the Third Circuit in *Kowalsky* interpreting the TCA, have consistently refused to permit recoveries against municipalities for injuries proximately caused by natural conditions of the ocean, regardless of whether lifeguards were present. *See, e.g., Knight v. City of Capitola,* 4 *Cal.App.*4th 918, 6 *Cal.Rptr.*2d 874 (1992) (holding no liability for failure to warn for bodysurfing injury occurring while lifeguard present); *Tessier v. City of Newport Beach,* 219 *Cal.App.*3d 310, 268 *Cal.Rptr.* 233 (1990) (holding city not liable for diving injury because ocean constitutes natural condition); *Morin, supra,* 215 *Cal.App.*3d 184, 263 *Cal.Rptr.* 479 (holding hazardous recreational immunity im-

munized county from liability for plaintiff's ocean diving injury); *City of Santa Cruz v. Superior Court of Santa Cruz County (Magana)*, 198 *Cal.App.*3d 999, 244 *Cal.Rptr.* 105 (1988) (holding presence of lifeguards did not remove city's immunity for plaintiff's river diving injury resulting from natural condition of public property); *Geffen, supra*, 197 *Cal.App.*3d 188, 242 *Cal.Rptr.* 492 (holding unimproved property immunity immunized county from plaintiff's ocean diving injury).

We recommend that the New Jersey Legislature also revisit the issue whether Section 4–8 immunity covers acts of omission and of commission by lifeguards.

-C-

▇▇▇▇ Ordinarily, the issue of proximate cause should be determined by the factfinder. *Scafidi v. Seiler*, 119 *N.J.* 93, 101, 574 *A.*2d 398 (1990). Proximate cause has been described as a standard for limiting liability for the consequences of an act based " 'upon mixed considerations of logic, common sense, justice, policy and precedent.' " *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 77–78, 222 *A.*2d 513 (1966) (quoting *Powers v. Standard Oil Co.*, 98 *N.J.L.* 730, 734, 119 *A.* 273 (1923), *aff'd o.b.*, 98 *N.J.L.* 893, 121 *A.* 926 (E. & A.1923)). Proximate cause as an issue, however, may be removed from the factfinder in the highly extraordinary case in which reasonable minds could not differ on whether that issue has been established. *Vega by Muniz v. Piedilato*, 154 *N.J.* 496, 509, 713 *A.*2d 442 (1998).

▇▇▇▇ Viewing the facts in light of the principles set forth in *Brill*, we conclude that as a matter of law, any negligence by the lifeguards did not proximately cause plaintiff's injuries. It is undisputed that plaintiff was injured when a large wave struck him, causing his head to be forced into the ocean floor. Plaintiff was an experienced surfer who had been at the beach nearly five hours before the accident. He therefore knew the ocean conditions and appreciated the risks associated with surfing in the choppy ocean caused in part by Hurricane Emily. According to S

& S, the rough ocean and the high risks are the very conditions that attract experienced surfers like plaintiff to the ocean beach in the first place. Consistent with that view, SEA–NJ on behalf of three surfers recently argued before the Appellate Division that their safety based on bad water and weather conditions caused by hurricanes should be decided by surfers because those conditions create the perfect environment for their sport. *State v. Oliver*, 320 *N.J.Super.* 405, 420, 727 *A.*2d 491 (App.Div.1999). Here, the perfect environment for surfing was the large waves that caused plaintiff's accident.

Furthermore, at the time of the accident there were two lifeguards patrolling the beach. It was the lifeguards' common practice to restrict bathers to an area deemed to be a reasonably safe distance from the beach. Pappas, the senior lifeguard on duty had approximately twenty years of experience patrolling the Cape May Beach; more than half of that time was spent at the First Avenue Beach. He did not find any justification to close the beach before or after plaintiff's injury. The lifeguards' stand was at the water's edge in the wet sand, only a few short yards from where one of the lifeguards eventually rescued plaintiff. Upon noticing plaintiff's distress, lifeguard Lewis immediately went to plaintiff's aid. While Lewis was attending to plaintiff, Pappas pulled the other bathers out of the water because he felt that it was not safe for him to patrol the entire beach alone while Lewis provided aid to plaintiff. After the lifeguards completed their emergency assistance to plaintiff, the beach was reopened to bathers.

Viewing those facts in light of the *Brill* standard convinces us that the alleged negligence of the lifeguards is too remotely or insignificantly related to plaintiff's accident, so that in a legal sense, the alleged fault of the lifeguards does not constitute "a cause of [the] accident, . . . [but] simply presents the condition under which the injury was received." *Brown v. United States Stove Co.*, 98 *N.J.* 155, 172, 484 *A.*2d 1234 (1984). Stated differently, we conclude that a reasonable jury could find only that

plaintiff's accident was caused by the waves and that any negligence by the lifeguards was not a proximate cause of plaintiff's accident.

The judgment of the Appellate Division remanding the matter for trial is reversed, and judgment is entered for the public entity.

HANDLER, J., dissenting.

This case presents the novel question of whether immunity overrides liability when there are multiple causes contributing to an accidental injury and only one of those causes would confer immunity on the municipality. The Court obviates the need to address this question, reasoning that, as a matter of law, the sole proximate cause of plaintiff's injury was the natural condition of the ocean. I do not subscribe to that conclusion, and therefore address the issue that I believe must be resolved to dispose of this case.

I

In construing and applying the Tort Claims Act ("TCA"), it is frequently observed that immunity for public entities is the rule and liability is the exception. *See N.J.S.A.* 59:2–1b. This notion supports the oft stated proposition that in the determination of whether an injured person can prevail against a public entity, "[w]hen both liability and immunity appear to exist, the latter trumps the former." *Tice v. Cramer*, 133 *N.J.* 347, 356, 627 *A.*2d 1090 (1993). Although that proposition does not constitute a basis for the Court's analysis and determination in this case, I believe it bears on the central issue that must be resolved, namely, the

effect of multiple causes of accidental injury under the TCA. I do not find clear support for the expansive conclusion that the TCA always immunizes a public entity from liability for an accidental injury where there is a combination of causes of that injury, only one of which confers immunity. In order to ascertain the intended effect of the TCA in this context, an examination of the language of the statute and its legislative history is required.

### A.

The TCA absolves a municipality from liability in respect of its natural property by providing:

> Neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach.
>
> [*N.J.S.A.* 59:4–8.]

The provision is silent on whether a condition of unimproved property that is combined with other causes of accidental injury necessarily confers immunity.

In determining the meaning of the unimproved property immunity under *N.J.S.A.* 59:4–8, we should first resort to the express language of the statute to ascertain whether that can yield a clear meaning. *Bergen Comm'l Bank v. Sisler*, 157 *N.J.* 188, 202, 723 *A.*2d 944 (1999) ("The first step in any statutory analysis is to examine the statute's plain language as the clearest indication of its meaning."). The TCA simply does not state that if a condition of unimproved property is one of a combination of causes of an accidental injury, immunity always follows. Rather, it is silent on whether such a condition necessarily confers immunity when it is a concurrent cause of the injury. The interpretative issue, therefore, is whether the statute should be construed to require that if only one of multiple causes of accidental injury gives rise to immunity—even though other causes would generate liability—no liability can be visited upon the municipality.

In determining the meaning of the unimproved property immunity under *N.J.S.A.* 59:4–8, the language of this provision should

be construed to assure its compatibility with other provisions of the TCA. *Seatrain Lines, Inc. v. Medina,* 39 *N.J.* 222, 226–27, 188 *A.*2d 169 (1963) (observing that provisions of statutes should be construed in harmony and as together effecting overall legislative intent). One area of the statute that expressly considers the relationship between immunity and liability involves governmental responsibility for public property in general. *N.J.S.A.* 59:3–11 provides:

> A public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility.

In effect, this provision contemplates both qualified immunity and limited liability in respect of the supervision over public property. The immunity provided by this section for a public employee is limited to a specific cause; "failure to provide supervision." But, it does not "exonerate" employees for a cause based on negligent supervision. The limited liability for public employees is similar to that contained in another section of the TCA, *N.J.S.A.* 59:2–7, which provides that a public *entity* is not exonerated for negligence once it undertakes to supervise a facility.

The approach espoused in these sections is based on the recognition that accidental injury resulting from the use of improved public property will often entail multiple causes. There is no obvious reason why that understanding does not inform the intended application of provisions governing accidental injury in the context of unimproved public property. The TCA should be read as a whole, its individual provisions harmonized, and construed in a way most consistent with the overall legislative intent. *See Fiore v. Consol. Freightways,* 140 *N.J.* 452, 466, 659 *A.*2d 436 (1995). A consideration of the legislative intent at the time the TCA was enacted compels the conclusion that the liability provisions of the TCA for negligent supervision of improved public property should be reconciled with its provisions regarding governmental responsibility for unimproved property.

In the absence of a clear meaning that can be derived from plain and unambiguous statutory language, determination of the under-

lying intent of the Legislature turns on consideration of extrinsic factors. *Wingate v. Estate of Ryan,* 149 *N.J.* 227, 236, 693 *A.*2d 457 (1997). In construing a statute that has its origins in the common law and incorporates common law principles, that analysis may sensibly "commence with an evaluation of 'the common law of New Jersey ... [a]t the time of the adoption of the statute.'" *Renz v. Penn Cent. Corp.,* 87 *N.J.* 437, 443, 435 *A.*2d 540 (1981) (citing *Egan v. Erie R.R. Co.,* 29 *N.J.* 243, 250, 148 *A.*2d 830 (1959)).

The historical key to unlocking the legislative understanding of concurrent causation in the context of sovereign immunity, the common-law progenitor of the TCA, is the common law concept of contributory negligence. Contributory negligence emerged as a doctrine of the common law with judicial origins dating to 1809. *Renz, supra,* 87 *N.J.* at 450, 435 *A.*2d 540 (citations omitted). It found its way into New Jersey common law in the middle of the last century. *See Central R.R. Co. v. Moore,* 24 *N.J.L.* 824 (E. & A. 1854); *Vandegrift v. Rediker,* 22 *N.J.L.* 185 (Sup.Ct.1849). Early on, the doctrine of contributory negligence precluded recovery on the part of a negligent plaintiff, regardless of the degree of his or her culpability. *Renz, supra,* 87 *N.J.* at 451, 435 *A.*2d 540. Gradually, however, the doctrine experienced liberalizing influences. Most significantly, courts began to focus on the fairness and need to identify and clarify the real or substantial causes of injury in the tort law, and recognized that in the application of contributory negligence, it must be shown that a plaintiff's conduct is a direct or effective cause of the accident in order to bar recovery. In *State v. Lauer,* 55 *N.J.L.* 205, 215, 26 *A.* 180 (Sup.Ct.1893), the Court wrote:

> In the trial of cases of this kind, where it appears that both parties were in fault, the primary consideration is whether the faulty act of the plaintiff was so remote from the injury as not to be regarded, in a legal sense, as a cause of the accident, or whether the injury was proximately due to the plaintiff's negligence, as well as to the negligence of the defendant. If the faulty act of the plaintiff simply presents the condition under which the injury was received, and was not, in a legal sense, a contributory cause thereof, then the sole question will be whether, under the circumstances, and in the situation in which the injury was received, it was due to

the defendant's negligence. But if the plaintiff's negligence proximately—that is, directly—contributed to the injury, it will disentitle him to a recovery, unless the defendant's wrongful act was willful, or amounted to an intentional wrong.

[*Id.* at 215, 26 *A.* 180 (emphasis added)].

Principles of fairness in assigning responsibility and allocating damages also gained strength in the evolution of tort law. A major change in that growth was the emergence of the doctrine of comparative negligence.[1] The Legislature overtook the common law by adopting an act providing for comparative negligence, effective on May 24, 1973. *N.J.S.A.* 2A:15–5.1, –5.2. Influenced by considerations of public policy implicit in that legislative action, this Court subsequently rejected contributory negligence as part of New Jersey common law and adopted comparative negligence principles to govern the allocation of fault in tort actions. *Renz, supra,* 87 *N.J.* at 456, 435 *A.*2d 540.

At the time of the TCA's adoption in 1972, then, principles of contributory negligence were in the course of being modified and superseded by those of comparative negligence. The Legislature's clear understanding of principles of comparative negligence and concurrent causation is demonstrated by explicit and implicit references to proximate causation in the TCA. For example, the TCA adopts an express comparative negligence principle in *N.J.S.A.* 59:9–4:

Contributory negligence shall not bar recovery in an action by any party ... to recover damages to the extent permitted under this act, if such negligence was not greater than the negligence of the party against whom recovery is sought or was not greater than the combined negligence of the persons against whom recovery is sought. Any damages sustained shall be diminished by the percentage of negligence attributable to the person recovering.

The comment to *N.J.S.A.* 59:9–4 reflects the Legislature's appreciation of the state of the common law:

The purpose of this provision is to humanize the law by eliminating the harsh doctrine of contributory negligence and adopting in its place comparative negligence. Under the doctrine of contributory negligence a plaintiff is barred from

---

[1] While as late as 1968 all but seven states still recognized the defense of contributory negligence in its traditional form, by 1974 comparative negligence had become the majority rule. *Renz, supra,* 87 *N.J.* at 453, 435 *A.*2d 540.

recovery if his own negligence contributed to his injury—no matter how great or how slight that contributory negligence may have been. Under the comparative negligence doctrine contained in this provision the damages to which an injured party would be entitled under the act will be diminished in proportion to the amount of negligence attributable to him.

At least twelve states have adopted a form of the comparative negligence rule.... In fact, in a recent decision in which the New Jersey Supreme Court attempted to deal with the potential unfairness of the contributory negligence rule, Justice Francis, in a concurring opinion joined in by Justice Proctor, called upon the Legislature to adopt some form of comparative negligence. *O'Brien v. Bethlehem Steel Corporation*, 59 *N.J.* 114, 125–128, 279 *A.*2d 827 (1971).

Although there are a number of different comparative negligence plans, it is proposed that the so-called "pure form" of comparative negligence be adopted.... *It is [ ] consistent with the general approach of this act which is intended to increase settlement and to reasonably and fairly increase the compensation of injured persons. It is anticipated that this form of comparative negligence will apply in all actions in which a public entity or public employee is a party.*
[Comment on *N.J.S.A.* 59:9–4 (1972) (emphasis added).]

More significantly, the general liability provision that applies to dangerous conditions of improved public property is expressed in language that is virtually identical to that used in the immunity provision for unimproved public property. The unimproved property immunity provision applies where "an injury [was] caused by a condition of any unimproved property." *N.J.S.A.* 59:4–8. The improved property liability provision is implicated when "the injury was proximately caused by the dangerous condition." *N.J.S.A.* 59:4–2.

It is indisputable that in providing for liability caused by the dangerous condition of property under *N.J.S.A.* 59:4–2, the Legislature contemplated that principles of comparative negligence would apply despite the absence of any express reference to concurrent causation or comparative negligence in that statutory section. *Cf. Nora v. Township of Livingston*, 171 *N.J.Super.* 579, 410 *A.*2d 278 (App.Div.1980) (per curiam) (noting in situation involving joint tortfeasors relevance of comparative negligence principles in allocating liability among plaintiff, defendant gas company, and defendant municipality for injury caused by negligently maintained road). There is not the slightest suggestion or intimation that in providing a specific immunity attributable to

unimproved property under *N.J.S.A.* 59:4–8, the Legislature intended to foreclose the application of comparative fault principles expressly recognized in *N.J.S.A.* 59:9–4, when there is a combination of multiple causes, some of which ordinarily give rise to liability. *See, e.g., Nora, supra,* 171 *N.J.Super.* 579, 410 *A.*2d 278. *See also Garrison v. Township of Middletown,* 154 *N.J.* 282, 309, 712 *A.*2d 1101 (1998) (Stein, J. concurring) (recognizing that Legislature clearly considered common law concepts of concurrent causation in drafting TCA and that such principles are relevant to immunity inquiry, although disagreeing with Court's position concerning definition of "dangerous condition" of improved public property).

Further support for this position can be found in other authority. The Court has recognized the relevance of California's TCA in lending meaning to our TCA. *E.g., Garrison, supra,* 154 *N.J.* at 289, 712 *A.*2d 1101; *Levin v. County of Salem,* 133 *N.J.* 35, 46, 626 *A.*2d 1091 (1993).

Principles of comparative fault or causation were recognized and applied by California in the context of a combination of causes (including one conferring immunity) resulting in accidental injury. In a case in which statutory design immunity was applicable, the California Supreme Court imposed liability on negligent failure-to-warn grounds, and refused to confer immunity. *Cameron v. State,* 7 *Cal.*3d 318, 102 *Cal.Rptr.* 305, 497 *P.*2d 777 (1972) (in bank). The court explained that because "negligent failure to warn is a concurrent cause of [plaintiffs'] injuries ... this concurrent negligence is an independent basis for recovery." *Id.* at 783. The court accepted the plaintiffs' contention "that, even if design immunity is eventually found to be applicable, it would not immunize the state for its concurrent negligence in failing to warn of the dangerous condition." *Ibid.*

The California court also relied on another decision, *Flournoy v. State,* 275 *Cal.App.*2d 806, 80 *Cal.Rptr.* 485 (1969). There the court stated that although the plaintiff-heirs could be denied recovery for the state's active negligence in creating a danger by

building a faulty bridge, they might still recover for the state's passive negligence in failing to warn of that danger. The *Cameron* court explained:

> There may be two concurring, proximate causes of an accident.... Regardless of the availability of the active negligence theory, plaintiffs were entitled to go before a jury on the passive negligence theory, i.e., an accident caused by the state's failure to warn the public against icy danger known to it but not apparent to a reasonably careful highway user.
>
> [497 *P.*2d at 784 (quoting *Flournoy,* 275 *Cal.App.*2d at 811, 80 *Cal.Rptr.* 485).]

Further, the court in *Cameron* specifically rejected the defense argument that the design immunity provided in Section 830.6 of California's TCA must "prevail" over any liability for a dangerous condition of public property under section 835 of that act. *Ibid.* The court adopted the reasoning in *Flournoy:*

> By force of its very terms the design immunity of section 830.6 is limited to a design-caused accident. (Citation omitted). It does not immunize from liability caused by negligence independent of design, even though the independent negligence is only a concurring, proximate cause of the accident.
>
> [*Ibid.* (quoting *Flournoy,* 275 *Cal.App.*2d at 811, 80 *Cal.Rptr.* 485.)]

These decisions clearly recognize that in a context in which accidental injury may be attributable to a combination of causes only one of which confers immunity, it was not the intent of the TCA that immunity would necessarily override liability; significantly these decisions had been rendered when this State adopted its TCA, and presumably expressed an understanding of the law that our Legislature shared. *Garrison, supra,* 154 *N.J.* at 289, 712 *A.*2d 1101; *Levin, supra,* 133 *N.J.* at 46, 626 *A.*2d 1091.

Another instructive California case, *Gonzales v. City of San Diego,* 130 *Cal.App.*3d 882, 182 *Cal.Rptr.* 73 (1982), involved the drowning death of a woman who was swimming at a beach that had lifeguards voluntarily provided by the city of San Diego. Her children sued the city, alleging a negligent failure to warn of a dangerous riptide. The trial court granted the city's demurrer asserting absolute immunity under a provision of California's TCA providing immunity for injuries resulting from a natural condition at any unimproved public property. The appeals court reversed. The court assumed that the beach was unimproved property, but

held that the requirement that the injury be caused by a "natural condition" was not met. Rather, the court found that plaintiff had pled a "hybrid dangerous condition," described as "partially natural and partially artificial in character, the result of a combination of a natural defect within the property and the third party conduct of the [c]ity," which allowed the claim against the city to go forward. *Id.* at 885, 182 *Cal.Rptr.* 73. The court explained that "the dangerous condition [ ] arose from the existence of a natural dangerous riptide condition, plus [the][c]ity's voluntarily providing lifeguard service at [the][b]each (a duty with which it impliedly was not burdened under [the TCA] ), and its performing that voluntarily assumed service negligently by failing to warn of the known, hazardous, natural condition." *Ibid.* *Gonzales* thus reflects an intent to account for multiple causes of accidental injury, even where one of those causes is accorded statutory immunity.[2]

## B.

In my view, in dealing with distinct, multiple or concurrent causes that contribute to an accidental injury, one of which gives rise to governmental immunity, the Legislature intended to invoke principles of comparative negligence or fault. Therefore, I believe the proper principle of law to be applied is one that compares and balances the immunity-conferring and liability-imposing causes, as well as any contributory negligence on the part of the plaintiff, and accords each cause its proportionate weight in the allocation of statutory responsibility.

---

[2] The majority criticizes *Gonzales* and notes it was superseded by *Cal. Gov. Code* § 831.21. *Ante* at 542, 732 *A.2d* at 1040. That, however, indicates only that California's legislature has chosen to provide a specific immunity for lifeguards, not that the original basic intent of the TCA—that immunity will not necessarily or always supplant concurrent independent negligence—was inaccurately expressed in *Gonzales,* as well as in *Cameron* and *Flournoy.* In fact, *Gonzales* was never overruled by the California Supreme Court. The Legislature of course, may always determine as a matter of policy whether an immunity in a specific situation must prevail notwithstanding the presence of independent concurrent fault.

In balancing the relative weight of these causes, where a dangerous condition of unimproved property combines with the negligent supervision of a municipal employee resulting in a plaintiff's injury, it is appropriate to allocate damages to the government entity to the extent that a liability-imposing cause substantially increased the risk of injury. *See Gonzales, supra,* 130 *Cal.App.*3d 882, 182 *Cal.Rptr.* 73 (allowing claim against municipality to go forward on "hybrid dangerous condition" theory, because public entity's negligent conduct increased risk of danger posed by natural condition); *see also Scafidi v. Seiler,* 119 *N.J.* 93, 108–109, 574 *A.*2d 398 (1990) (holding where there is evidence that defendant's negligent act or omission increased risk of harm, and trier of fact determines that this increased risk was "substantial factor" in producing harm actually suffered by plaintiff, liability may be imposed); *Evers v. Dollinger,* 95 *N.J.* 399, 417, 471 *A.*2d 405 (1984) (same). Utilizing "increased risk" as a measure of liability is "consistent with the principles underlying the comparative-negligence statute, *N.J.S.A.* 2A:15–5.1 (damages sustained shall be diminished by percentage of negligence attributable to person recovering); *Scafidi, supra,* 119 *N.J.* at 113, 574 *A.*2d 398; *see also Ostrowski v. Azzara,* 111 *N.J.* 429, 449–51, 545 *A.*2d 148 (1988) (finding that damages should be allocated to reflect doctor's malpractice that increased risk of harm attributable to plaintiff's condition and acts of personal negligence). This analysis also comports with the principle of tort law that recognizes that a duty of care that encompasses a victim's own potential wrongdoing or contributory negligence can be a proper basis for liability. *See Steele v. Kerrigan,* 148 *N.J.* 1, 689 *A.*2d 685 (1997); *Cowan v. Doering,* 111 *N.J.* 451, 545 *A.*2d 159 (1988).

A critical factor in these situations is that a protective duty is voluntarily assumed by the governmental entity. *See Restatement (Second) of Torts* § 323(a) (stating that rendering necessary protective services to another may subject provider to liability for injury for negligence "if [the] failure to exercise [reasonable] care increased the risk of such harm."). Equally important in assessing increased risk is the "induce[ment of] public reliance" on the

part of the public entity by assuming a protective duty. *Gonzales, supra*, 130 *Cal.App.*3d at 886, 182 *Cal.Rptr.* 73. Thus, "when a public entity voluntarily provides a protective service for particular members of the public, which induces their reliance on the proper performance of that service, [the TCA] does not necessarily provide immunity." *Arroyo v. State*, 34 *Cal.App.*4th 755, 764, 40 *Cal.Rptr.*2d 627 (1995). "Put another way, the immunity is inapplicable where a public entity's conduct actively and negligently increases the degree of danger posed by a natural condition." *Mercer v. California*, 197 *Cal.App.*3d 158, 167, 242 *Cal.Rptr.* 701 (Ct.App.1988). *See also Lee v. Doe*, 232 *N.J.Super.* 569, 579, 557 *A.*2d 1045 (App.Div.1989) (holding that immunity for inadequate police protection would not apply "if the police officer caused the victim to rely on him for protection or the police officer otherwise increased the risk of injury to the victim.").

These principles of comparative negligence and concurrent causation are appropriately invoked in construing and applying the TCA. To reiterate, comparative causation has long been recognized in the common law of New Jersey. It is entirely reasonable to view the choice of language in *N.J.S.A.* 59:4–8 as implicitly incorporating the common law principles of concurrent comparative causation. Thus, where a concurrent cause—such as the negligent supervision of a public employee—independently or concurrently causes, or substantially increases the risk of injury posed by other causes, any specific liability provision covering this cause should provide a recovery to plaintiff in proportion to the fault attributable to that cause. In this case, imputing principles of comparative causation to *N.J.S.A.* 59:4–8 reconciles a legislative intent to protect bathers from negligent supervision by lifeguards with the text of the statute.

To the extent that the negligent supervision of municipal employees substantially increased the risk of injury posed by the condition of unimproved property, namely, the ocean, that percentage of increased risk may be used to impose and allocate liability. Thus, allowing recovery only for the increased risk attributable to

negligent supervision simultaneously acknowledges the immunity ascribed to the condition of the unimproved property by exonerating the municipality to the extent the immunity-conferring condition proximately contributed to the accidental injury.

### III

The majority determines as a matter of law that plaintiff's accident was caused only by the waves, a natural condition of the ocean, *ante* at 544–45, 732 *A.*2d at 1041, and thus grounds its holding on plaintiff's failure to establish that the lifeguards' negligent supervision proximately caused his injury. *Ante* at 543, 732 *A.*2d at 1041. I disagree. I believe that the Court more properly should determine liability based on comparative negligence principles, taking into account that this case presents concurrent or multiple causes.

This record cannot be viewed as excluding negligent supervision by the lifeguard as an independent concurrent cause. Further, the record also reveals a basis for determining that plaintiff was contributorily negligent.[3] Consequently, there is evidence that the condition of the ocean coupled with the employees' negligent supervision and plaintiff's own negligence combined to contribute to the accidental injury.

Comparative negligence doctrine does not foreclose the entry of summary judgment when there are no genuine disputes over facts that are material to the issue of proximate cause. *Vega by Muniz v. Piedilato*, 154 *N.J.* 496, 529, 713 *A.*2d 442 (1998) (Handler, J., concurring) (stating that our comparative negligence jurisprudence "permits courts to enter summary judgment in the defendant's favor in the extraordinary case where no rational juror

---

[3] The Court points out that plaintiff was an experienced surfer, familiar with the dangers of a high surf, and had been at the beach five hours on the day in question. *Ante* at 535, 543, 732 *A.*2d at 1036, 1041. Because of plaintiff's experience and the length of time he had been at the beach, he knew the ocean conditions and appreciated the risks associated with surfing in the turbulent ocean.

could conclude that the plaintiff's negligence did not exceed the defendant's negligence."). Here, the record does not allow the Court to conclude, as a matter of law, that the condition of the ocean was the sole proximate cause of the accident. Nor does the record require the determination, as a matter of law, that plaintiff's own negligence, even when combined with the condition of the ocean, which would confer immunity, exceeds any fault that would be attributable to the negligent supervision of the lifeguards. That is particularly so in a case, such as this, where the defendant's duty to afford protection includes the prevention of plaintiff's possible wrongdoing. *See Kerrigan, supra,* 148 *N.J.* 1, 689 *A.*2d 685; *Cowan, supra,* 111 *N.J.* 451, 545 *A.*2d 159. Thus, there remains the ultimate issue whether the negligent supervision of the lifeguards substantially increased the risk of accidental injury to plaintiff posed by the condition of the ocean and whether that increased risk outweighs other causes of the accidental injury that may be attributed to either or both the condition of the ocean and plaintiff's contributory negligence.

I conclude that plaintiff has presented genuinely disputed issues of material fact that must be resolved by a trial. I would, therefore, affirm the judgment of the Appellate Division.

### IV

For the reasons stated, I dissent. Justices O'HERN and STEIN join in this opinion.

O'HERN, J., dissenting.

The Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 14–4, allows recovery against public employees and public entities when the claim is based on the negligent supervision of recreational activities. A slim but triable issue of fact was presented here concerning whether Cape May's lifeguards were negligent in their supervision of the City's beach. I would therefore affirm the judgment of the Appellate Division allowing the claim to proceed. I would

do so substantially for the reasons stated in its comprehensive opinion:

> We agree with the motion judge that the beach and the ocean are unimproved property. We also agree that once a bather enters a body of water, such as a river, lake, ocean or bay which is unimproved, there can be no liability for injuries which occur solely due to conditions encountered in that unimproved body of water. Thus, a person who encounters turbulence, forceful waves or uneven surfaces and who is injured solely due to those conditions has no cause of action against the public entity or public employee. That is because the public entity and public employee have no obligation to improve natural conditions or to ameliorate inherent but dangerous features of unimproved property. In short, the public entity and public employees have no obligation to make unimproved property safe. Moreover, the public entity has no obligation to post signs or flags concerning the condition of the water and inform bathers if it is safe for them to enter the water. To that extent, we affirm the order granting summary judgment insofar as plaintiff asserts that the ocean constituted a dangerous condition and that the defendant had a duty to warn independent of its decision to provide lifeguards at the beach.

> On the other hand, the decision to provide protective services at a beach and potential liability for negligent performance of those services does not implicate the reasons for the immunity for unimproved property. The unimproved property immunity is an extension of the immunity conferred on public entities and their employees for failing to provide supervision of public recreational facilities. It is designed to encourage public entities to acquire and provide recreational facilities. It also confers on the public entity the authority to provide or not to provide supervision, to improve or not to improve property. The State, county or municipality may still provide access to the public to recreational areas such as a river, lake, bay or ocean. The public entity has no legal obligation to supervise the activities at these sites. However, once a public entity decides to supervise the activities at the site, such as by providing lifeguards, it has presumably determined that more benefits are derived by providing lifeguards than by exercising its right to do nothing. Once it has made that decision, the fundamental reason for its immunity vanishes.

> [303 *N.J.Super.* 481, 488–89, 697 *A.2d* 182 (App.Div.1997).]

I add only these observations:

## I

### A.

The City invokes the maxim that "[w]hen both liability and immunity appear to exist, the latter trumps the former." *Tice v. Cramer*, 133 *N.J.* 347, 356, 627 *A.2d* 1090 (1993). In this instance, the City is referring to the general immunity for the "natural

condition" of the beach. *See N.J.S.A.* 59:4–8. As illustrated by the facts in *Tice*, the *Tice* rule establishes the predominance of sovereign immunity when the bases of both liability and immunity derive from the same injurious conduct. *Tice*, for example, involved an accident caused by a police car that was engaged in a hot pursuit of a fleeing suspect. The issue of whether immunity trumped liability, or vice versa, arose because various sections of the TCA governing the same conduct pointed in different directions if one assumed that the  pursuing police officer was negligent. *N.J.S.A.* 59:3–1a, allowing for recovery from public employees to the same extent as private persons for injuries caused by an employee's acts or omissions, appeared to provide a basis of direct liability for the officer, and *N.J.S.A.* 59:2–2a supported vicarious liability for the municipality. *Tice, supra*, 133 *N.J.* at 353–54, 627 *A.*2d 1090. At the same time, both the officer and the town appeared immunized by *N.J.S.A.* 59:5–2b(2), which establishes immunity for injuries caused by "an escaping or escaped person," and *N.J.S.A.* 59:3–3, which protects public employees acting "in good faith in the execution or enforcement of any law." *Tice, supra*, 133 *N.J.* at 354, 627 *A.*2d 1090. The police officer's conduct was unitary. The officer was driving negligently but was pursuing a fleeing felon in good faith. We said the express immunity for good faith pursuit made the officer and municipality immune.

The *Tice* rule—that immunity trumps liability—does not apply in this case because there were two separate but concurrent causes of plaintiff's injury: the natural condition of the ocean waves and the negligence of Cape May's lifeguards. Only one standard governs the lifeguards' conduct. Unless the facts conclusively established that no rational fact finder could find that the lifeguards' negligent conduct was not a contributing cause of the injury, there is no immunity to trump that standard. Although there are two causes of injury, the City fails to explain why the immunity attributable to one cause would trump liability with respect to the concurrent cause. The municipality's immunity for the natural condition of the ocean has no effect, trumping or

otherwise, on the municipality's liability for the alleged negligence of its lifeguards.

## B.

The City also suggests in its brief that liability cannot be based on the lifeguards' negligence because the accident was exclusively caused by a wave striking the plaintiff, causing his head to strike the ocean floor. That argument begs the question of concurrent causation. Plaintiff does not contend that the lifeguards drove his head into the sand. He contends that he would not have been in the surf in the first place had the lifeguards exercised due care. *See Kelly v. Gwinnell,* 96 *N.J.* 538, 543, 476 *A.*2d 1219 (1984) (explaining how negligence of social host may create risk of intervening harm). To dismiss plaintiff's negligence claim based on a lack of causation is somewhat like telling the passengers on the Titanic that they may not complain that the owners told the captain to steam ahead into poor weather because, after all, it was the iceberg that caused them to be thrown into the sea.

If that is too facile a response, I repeat what we said in *Weiss v. New Jersey Transit,* 128 *N.J.* 376, 380, 608 *A.*2d 254 (1992):

> To state the principles applicable to [a tort claim] action is easy. *See Rochinsky v. State,* 110 *N.J.* 399, 541 *A.*2d 1029 (1988). The Court is frequently divided when it comes to their application because to pin down the concept of causation in law is so difficult. *See, e.g., Troth v. State,* 117 *N.J.* 258, 566 *A.*2d 515 (1989) (did the legislative immunity with respect to the maintenance of natural lands take precedence over the statutory liability for a defective condition of a man-made dam?); *Kolitch v. Lindedahl,* 100 *N.J.* 485, 497 *A.*2d 183 (1985) (did the legislative immunity for establishing a speed limit take precedence over a negligent failure to warn of dangerous curve in the road?). At first glance, the cases might appear to be inconsistent, allowing a cause of action in *Troth,* but not in *Kolitch* or *Rochinsky.* In fact, each case involves a search for a unifying principle—to identify the cause of the accident, e.g., in *Troth,* was it the flowing waters or the artificial structure that caused the injury, and to ask if that identified cause or condition is one that the Legislature intended to immunize.

So too here, we must ask if the "identified cause," the negligence of the lifeguards, is a cause that the Legislature intended to immunize.

The majority's concerns about the California Legislature's 1987 amendment of its Tort Claims Act in response to *Gonzales v. City of San Diego,* 130 *Cal.App.*3d 882, 182 *Cal.Rptr.* 73 (1982), were presaged by the Appellate Division and carefully handled in its opinion.

The flaw in the *Gonzales* decision was that the conduct of the lifeguards turned an unimproved beach into a "hybrid" form of improved property.

> The *Gonzales* "hybrid condition" rationale is thus directly inconsistent with the plain meaning of the absolute immunity language embodied in section 831.2 [of the California TCA]. Moreover, the *Gonzales* court imposed " 'dangerous condition' liability, under section 835, for the City's failure to warn the beach user of the 'hybrid dangerous condition.' A component of the 'hybrid dangerous condition,' however, was the City's failure to warn of the natural rip current. In other words, the City's 'failure to warn' is treated not only as the basis for 'dangerous condition' liability, but also as an integral part of the dangerous condition itself. The circularity of using the City's 'failure to warn' in two distinct capacities to establish liability completely emasculates natural condition immunity."
>
> [*Geffen v. County of Los Angeles,* 197 *Cal.App.*3d 188, 242 *Cal.Rptr.* 492, 495 (1987) (citation omitted).]

The 1987 amendment of the California TCA responded to that circular reasoning in *Gonzales.* Section 831.21 of the California TCA now provides:

> (a) Public beaches shall be deemed to be in a natural condition and unimproved notwithstanding the provision or absence of public safety services such as lifeguards, police or sheriff patrols, medical services, fire protection services, beach cleanup services, or signs. The provisions of this section shall apply only to natural conditions of public property and shall *not limit any liability or immunity that may otherwise exist pursuant to this division.* (Emphasis added.) 4

The liability that "otherwise exists" in New Jersey is under *N.J.S.A.* 59:3–11, which expressly declines to exonerate "a public

---

4 Our Appellate Division took pains in its ruling to explain:

> Moreover, the public entity has no obligation to post signs or flags concerning the condition of the water and inform bathers if it is safe for them to enter the water. To that extent, we affirm the order granting summary judgment insofar as plaintiff asserts that the ocean constituted a dangerous condition and that the defendant had a duty to warn independent of its decision to provide lifeguards at the beach.
>
> [303 *N.J.Super.* at 489, 697 *A.*2d 182.]

employee for negligence in the supervision of a public recreational facility." Plaintiff should have the opportunity to attempt to prove that Cape May's lifeguards contributed to cause his injuries and to have a jury evaluate the causation question and assess the municipality's liability, if any, for his broken neck. At the summary judgment stage, a court may not usurp the jury's role and declare without benefit of a factual hearing that the surf, and only the surf, caused the harm.

## II

An even more significant reason impels me to reject the City's arguments. To accept the City's arguments would mean that public entities providing lifeguard service have no duty to save drowning ocean bathers. For that is the essence of the City's reasoning. A child who ventures too far into the surf may be in danger of drowning as a result of being struck by a wave. Under the City's argument, a paid public lifeguard would be under no legal duty to exercise ordinary care to save that drowning child from the surf because it is absolutely immune if a wave strikes the child or sucks the child out to sea. That would be bad law and bad public policy.

Promotion of tourism has always been a major item on our State's agenda. Television viewers and radio listeners throughout the area cannot forget the refrain made familiar by a former governor: "New Jersey and You, Perfect Together." In 1997, tourists spent $25.5 billion in our state, making tourism New Jersey's second largest industry. The Jersey Shore is the State's dominant tourist attraction. We would not want to have to tell tourists that our posted lifeguards have no legal duty to protect them.

The importance of lifeguards to the shore economy is immediately apparent to anyone visiting our beaches on a summer afternoon. A short ride along the coast reveals that bathers park their cars, pay for beach badges, and unfold their towels near those points where shore municipalities have stationed lifeguards.

The unpatrolled beaches between the lifeguard stands are relatively unused, even though access to those beaches may be free. Perhaps the best evidence of the link between lifeguards and beach revenue is the fact that most seashore municipalities choose to fund lifeguard programs despite the fact that *N.J.S.A.* 59:2–7 [5] protects them from being sued for declining to do so. Some beach communities designate portions of their beaches as "protected and established" bathing beaches and prohibit bathing except at such beaches and when lifeguards are provided. *State v. Oliver,* 320 *N.J.Super.* 405, 418, 727 *A.*2d 491 (App.Div.1999).

Although the dominant theme of the TCA is immunity, *Malloy v. State,* 76 *N.J.* 515, 519, 388 *A.*2d 622 (1978), the Act makes a careful balance between immunity and liability. The Act declares

the public policy of this State [to be] that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions in this act should be construed with a view to carry out the above legislative declaration.

[*N.J.S.A.* 59:1–2.]

A fair and uniform principle of the Act is that public entities should be liable for their negligent supervision of recreational facilities. *N.J.S.A.* 59:3–11. The State of Hawaii (whose beaches rival New Jersey's as a destination for tourists) has the same public policy. The Hawaii Supreme Court has held that "[m]embers of the public who patronized [the City's beach] had the right to assume that the lifeguards on duty at the beach were qualified for the duties to which they were assigned. They had the right to rely upon the competence and vigilance of these City employees." *Kaczmarczyk v. City and County of Honolulu,* 65 *Haw.* 612, 656 *P.*2d 89, 93 (1982).

To sum up, the City of Cape May argues that it is entitled to absolute immunity based upon the unimproved property immunity,

---

[5] "A public entity is not liable for failure to provide supervision of public recreational facilities; provided, however, that nothing in this section shall exonerate a public entity from liability for failure to protect against a dangerous condition as provided in [*N.J.S.A.* 59:4–1 to 4–10.]"

*N.J.S.A.* 59:4–8, because the injury was caused exclusively by a wave, one of the naturally occurring forces of the ocean. "Each subsection [of the Act however] should be read with respect to the subject matter of the others and in harmony with each other and with the whole." *Brown v. Brown,* 86 *N.J.* 565, 577, 432 *A.*2d 493 (1981) (citations omitted). We ought not lose sight of the fact that the impetus for the enactment of the TCA was the Court's decision in *Willis v. Department of Conservation and Economic Development,* 55 *N.J.* 534, 264 *A.*2d 34 (1970), abolishing sovereign immunity. In *Willis,* a three-year-old child was bitten after she attempted to feed sugar to a caged bear. *Id.* at 535, 264 *A.*2d 34. It was not contended that the intervening cause of the child's injury, the bear's attack, insulated the park attendants from liability for negligent supervision. The public policy of the State is that public entities providing paid lifeguard service and charging admission to their beaches do have a legal duty to use ordinary care to protect bathers in peril.

HANDLER and STEIN, JJ., join in this opinion.

*For reversal*—Chief Justice PORITZ and Justices POLLOCK, GARIBALDI and COLEMAN—4.

*For affirmance*—Justices HANDLER, O'HERN and STEIN—3.